Jeffrey W. WILLIAMS, Susan K. Williams On their own behalf and as representatives of a class of homeowners, J. Peter Bittner, Marsha H. Bittner, Mary S. Boyd, Richard E. Nault, Appellants,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ARLINGTON, Individually and as rep. of a class of lenders, Federal Home Loan Mortgage Corp., Arlington-Fairfax Savings and Loan Association, Herndon Federal Savings and Loan Association, Appellees.

Arthur G. POTE, Laura R. Pote, Angel Saltos, Beatriz De Saltos, Appellants,

v.

WASHINGTON–LEE SAVINGS AND LOAN ASSOCIATION, Appellee.

Nos. 80–1446, 80–1005.

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1981.

Decided May 26, 1981.

Rehearing and Rehearing En Banc Denied July 7, 1981.

Paul D. Scanlon, Fairfax, Va., for appellants.

E. Waller Dudley, Fairfax, Va., and Robert T. Lasky, Washington, D. C. (Boothe, Prichard & Dudley, Paul C. Kincheloe, Jr., Kincheloe & Carlson, Jesse B. Wilson, III, McCandlish, Lillard, Church & Best, Fairfax, Va., Robert T. Lasky, Mark C. Ellenberg, Cadwalader, Wickersham & Taft, Washington, D. C., on brief in No. 80–1446) (W. Curtis Sewell, John E. Coffey, Thomas

& Sewell, Alexandria, Va., on brief in Nos. 80–1446 and 81–1005) for appellees.

Before BUTZNER, PHILLIPS and MUR-NAGHAN, Circuit Judges.

·MURNAGHAN, Circuit Judge:

The case touches many Americans, for it involves the common experience of purchasing a home. Customarily one contemplates a borrowing secured by a lien on the residential parcel to meet a substantial portion of the purchase price. Few are able first, before buying a house, to accrue all the necessary funds.

It is from that common experience that the present case evolves. The facts are influenced by another common experience of less ancient lineage, namely, persistent, consistently high, rates of inflation, accompanied by increased interest rates.

The plaintiffs in the four consolidated cases [1] are (a) in two of the cases, the persons who, when they bought their homes some time ago, imposed deeds of trust on the parcels of residential real estate as security for loans incurred to meet part of the purchase price and (b) in all four cases, the persons who subsequently bought the real estate, and, in doing so, sought to assume the liabilities secured by the deeds of trust and to have them continue in force for the balance of their original terms, typically 30 years. The defendants are the lending institutions, and the questions at issue all coalesce into the ultimate one of whether provisions in the deeds of trust known as due-on-sale clauses purporting to permit acceleration of the maturity of the loans upon sales of the premises (a) were triggered, and (b), if triggered, were legally enforceable.[2]

---

1. Three of the cases, given the combination title of *Williams, et al. v. First Federal Savings and Loan Association, et al.*, No. 80–1446, were consolidated for trial below. The fourth, *Pote v. Washington-Lee Savings and Loan Association*, No. 81–1005, was consolidated with the others on appeal.

2. *Williams, et al. v. First Federal Savings and Loan Association, et al.*, involving three of the transactions before us, attacks only on the grounds that the due-on-sale clauses were not triggered, in view of the form the transactions took. *Pote v. Washington-Lee Savings and Loan Association* raises that question and the additional contention as well, that, if the due-on-sale clause was, indeed, triggered, it was, nevertheless, legally unenforceable.

A preliminary matter for consideration is the one of our jurisdiction to hear the cases. The *Pote* case presents no problem inasmuch as the parties are diverse. The Potes are residents of Michigan. The persons to whom they sold, the Saltos, are residents of Columbia. The defendant Washington-Lee Savings and Loan Association is a Virginia corporation with its principal office in Virginia.

Jurisdiction in the other three cases is not quite so certain. No diversity jurisdiction has been asserted, presumably because of the commonality of citizenship of some of the homeowners and of the lenders.

However, in the case of *Williams v. First Federal Savings and Loan Association of Arlington*, a federal question under 28 U.S.C. § 1331 has been raised. The deed of trust in that case was executed on April 27, 1977, well after the June 8, 1976 effective date of regulations of the Federal Home Loan Bank Board ("FHLBB"), originally codified as 12 C.F.R. § 545.6–11(f) and (g) and recodified in 1980 as 12 C.F.R. § 545.8–3(f) and (g). Those regulations provide, *inter alia*:

> An association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent. . . .

The deed of trust, on a uniform instrument form for use in Virginia for deeds of trust within the purview of operations by the Federal National Mortgage Association ("FNMA") and Federal Home Loan Mortgage Corporation ("FHLMC"), employed essentially the regulation language:

> If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, . . . Lender may, at Lender's option, declare all sums secured by this Deed of Trust to be immediately due and payable.

Thus, the federal question arises as to whether, as a matter of contract between the lender and the borrower, a provision having been included declaring immediately due and payable the deed of trust if all or any part of the real property securing the loan was sold or transferred, the transactions through which Mrs. Bailey and the Williams changed beneficial ownership constituted a sale or transfer as contemplated by the regulation.

It is true that the deed of trust states that it shall be governed by the law of Virginia, the

We choose, for simplicity's sake, in dealing with the first question, which is whether the due-on-sale clauses were, in fact, triggered, to single out for detailed description the transactions involving Jeffrey W. Williams *et ux*, since their case is the one which happens to supply the caption for reference purposes. However, since Thomas A. Bailey and Sharon S. Bailey actually had the contractual relations with First Federal Savings and Loan Association of Arlington, and not the Williams, who merely sought to assume the obligation of Mrs. Bailey (to whom all joint interests in the property had been conveyed by Mr. Bailey), we concentrate on the interests of Mrs. Bailey through whom the rights of the Williams derive.

On April 27, 1977, the Baileys purchased a home located at 8061 Powder Brook Lane, Springfield, Virginia. In · Virginia, the forms used to impose a mortgage security interest, or lien, on land commonly employed in other parts of the United States are not used. Instead, resort has been to the deed of trust. While the formalities differ, for many essential intents and purposes, though by no means all, a deed of trust is equivalent to a mortgage.[3]

While appellants urge that differences in the two types of security device play a relevant role in the formulation of the method employed to shift ownership of the homes in the several consolidated cases, and, in particular, from Mrs. Bailey to the Williams, it is not evident to us why that is so.[4]

The purchase price paid by the Baileys on April 27, 1977 ($63,831) was met in part by a loan from First Federal Savings and Loan Association of Arlington, in the face amount of $55,000 at the time of settlement, secured by a deed of trust. By 1980, the outstanding principal had been reduced

jurisdiction in which the property is located. That language, however, relates to the validity or invalidity of provisions and does not extend to questions of which, as between competing interpretations, should be accorded language when either would be perfectly valid.

The other two cases (*Boyd v. Arlington-Fairfax Savings and Loan Association* and *Milne v. Herndon Federal Savings and Loan Association*) are less certain as to jurisdiction, either because the association is state chartered or because the deed of trust, while to a federal savings and loan association, antedated the FHLBB regulations and did not conform to them in its language. Nevertheless, we proceed on the belief that they, too, properly raise a federal question. If, in fact, they should have been dismissed for want of jurisdiction, in view of the conclusions we have reached on the law, the result would not, because of *stare decisis*, significantly differ from a holding affirming the lower court.

3. *See Larchmont Homes, Inc. v. Annandale Water Co.*, 201 Va. 178, 181, 110 S.E.2d 249, 251 (1959) ("Black defines a deed of trust at page 503 as 'an instrument in use in many states, taking the place and serving the uses of a common-law mortgage, by which the legal title to real property is placed in one or more trustees, to secure the repayment of a sum of money or the performance of other conditions.' "); *Yasuna v. Miller*, 399 A.2d 68, 71–72 (D.C.Ct. of App.1979) ("Deeds of trust are viewed as generally equivalent to common-law mortgages, a mortgage being by definition an interest in property given as security for the

payment of a debt."); *LeBrun v. Prosise*, 197 Md. 466, 473–74, 79 A.2d 543, 547 (1951) ("This deed of trust is like deeds of trust which, we understand, are generally used in Virginia, West Virginia, and the District of Columbia in lieu of mortgages and are not infrequently so used in Montgomery and Prince George's Counties and perhaps in other counties bordering on the Potomac. It is also similar to deeds of trust ordinarily executed by corporations to secure *issues of negotiable or transferable* bonds. For most purposes any such deed of trust *is* a mortgage, . . . and is subject to some (but not all) statutory provisions relating to mortgages. . . . On the other hand, some statutory provisions distinguish between 'mortgage' or 'deed in the nature of a mortgage' and 'deeds of trust in the nature of mortgages' . . . ."); *but cf. Billingsley v. Mitchell*, 257 Md. 301, 304, 262 A.2d 746, 747 (1970) (". . . a deed of trust securing a debt although it serves the purpose and performs the function of a mortgage is not in the eyes of the Maryland law a mortgage or a deed in the nature of a mortgage, . . . .").

4. Thus, for example, the mortgagor owns an *equity* of redemption. A trustee, like a mortgagee, holds legal title, and the borrower has only equitable interests. *E. g. Everette v. Woodward*, 162 Va. 419, 426, 174 S.E. 864, 867 (1934) ("The trustee's power of sale is coupled with an interest; that is, he holds the legal title, while the grantor in the trust deed has the equitable title.").

to $53,903.63. The term of the loan was 30 years. Interest on the loan was fixed at 10% per annum.[5] Repayment was to be made in level monthly installments of $492. The deed of trust dated April 27, 1977, constituted a first lien in favor of the lender, First Federal Savings and Loan Association of Arlington.

On October 3, 1977, Mr. Bailey had relinquished all his interest in the Springfield, Virginia premises to Mrs. Bailey. She, in 1979, decided to sell. In the interim, since the time of the 1977 purchase, interest rates on financing for purposes of acquiring a house had radically altered, with the going rate having risen to approximately 15% per annum instead of the 10% financing which had been available to the Baileys when they purchased in 1977. As a consequence, in the secondary market in first mortgages, the actual value of the loan secured by the Bailey deed of trust was approximately $38,000, despite its face value of $53,903.63. In other words, a discount of approximately 29% had occurred.

To guard against the possibility of the adverse impact of such discounts, home lending organizations had resorted to insertion in the instruments covering loan transactions of "due-on-sale" clauses.[6] The clauses provided that, on transfer of the premises, by the borrower, unless the approval or consent of the lender was first obtained, the loan would be fully callable, becoming immediately due and payable, at the option of the lender.[7]

---

**5.** Some of the precise figures for the Bailey-Williams transaction do not appear in the record. We deprecate the failure of counsel to include in the record so relevant a document as the note secured by the deed of trust from the Baileys, containing as it does particulars of the loan terms. We have been able, nevertheless, to make reasonably accurate approximations. The figures need be only approximate for the illustrative purposes they serve.

Thus the 1977 interest rate applicable to the Bailey's borrowing from First Federal Savings and Loan Association of Arlington was somewhere between 10% and 10.25% per annum. For convenience, we shall refer to the annual interest rate payable by Mrs. Bailey as 10%.

**6.** Three of the four deeds of trust (one for each of the consolidated cases) employed a June, 1975 uniform instrument of the FNMA and the FHLMC, instrumentalities which, in conjunction with the FHLBB operated to further interests of the Federal Government in the residential lending area. Two of the four lenders (First Federal Savings and Loan Association of Arlington and Herndon Federal Savings and Loan Association) include in their titles the word "federal." Interestingly, the only lender to use another deed of trust form than the uniform FNMA–FHLMC document was one of the federal associations, Herndon Federal Savings and Loan Association. In the case of Arlington-Fairfax Savings and Loan Association, the appellants treated it as a federal association, asserting in the Complaint that it is "a federal savings and loan association under the provisions of the Home Owner's Loan Act, 12 U.S.C. § 1461 *et seq.* (Arlington-Fairfax converted)." Similarly, with respect to Washington-Lee Savings and Loan Association the Complaint alleged: "The Defendant is a state chartered Savings and Loan Association: a Federal Home Loan Bank Member; Seller Servicer for the Federal Home Loan Mortgage Corporation and an insured institution of the Federal Savings and Loan Insurance Corporation" and "a Federally related Lender."

In all events the deed of trust forms employed in general represented a nationwide federal policy favoring due-on-sale clauses.

**7.** The language in the Bailey deed of trust on April 27, 1977, in favor of First Federal Savings and Loan Association of Arlington read: "*Transfer of the Property; Assumption.* If all or any of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) Creation of a lien or encumbrance subordinate to this Deed of Trust ... Lender may, at Lender's option, declare all the sums secured by this Deed of Trust to be immediately due and payable...."

That language, from Section 17 of the Uniform FNMA–FHLMC instrument form, also was used in the case of the Pote deed of trust to Washington-Lee Savings and Loan Association dated March 14, 1976.

For another lender, Arlington-Fairfax Savings and Loan Association (the borrower being Mary S. Boyd), the phraseology under the deed of trust of November 29, 1977, initially was identical with that appearing in the Bailey-Williams and Pote deeds of trust. However, by an agreement of modification, also dated November 29, 1977, the language was changed to read: "IN THE EVENT TITLE to the property above described is transferred, the unpaid balance of the indebtedness hereby secured shall be immediately due and payable, at the option of the party of the third part."

In the case of Herndon Federal Savings and Loan Association, which had on June 24, 1975, made a secured loan to John K. Milne et ux. the

In current market conditions, the due-on-sale clause obviously would be viewed with distaste by people in the shoes of Mrs. Bailey, for a mortgage or deed of trust which could otherwise continue until the original fixed maturity date (here 2007) at an extremely favorable interest rate (10% as against the current 15%) would be lost to them. Such a loan, if transferable to a buyer through assumption thereof as part of his purchasing arrangements, would have a distinct economic value. To illustrate, Mrs. Bailey, if the loan were transferable, would be able to realize more from the sale of her house than if she were forced to comply with the due-on-sale clause.[8]

language ran: "If the aforesaid described property is sold or conveyed prior to the maturity date of the note hereinabove described and secured hereby, the said note shall be immediately due and payable in full at the option of the holder thereof."

Each deed of trust in the consolidated cases also contained in the margin the following capitalized statement:

NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED (or SECURED HEREBY).

The statement was mandated by Va.Ann.Code § 6.1–330.34 reading:

Where any loan is made secured by a mortgage or deed of trust on real property ... and the note, or mortgage or deed of trust evidencing such loan contains a provision that the holder of the note secured by such mortgage or deed of trust may accelerate payment of or renegotiate the terms of such loan upon sale or conveyance of the security property or part thereof, then the mortgage or deed of trust shall contain in the body or on the margin thereof a [the following] statement, either in capital letters or underlined: "Notice—The debt secured hereby is subject to call in full or the terms thereof being modified in the event of sale or conveyance of the property conveyed [secured hereby]."

The bracketed language appeared in the initial enactment by Ch. 292 of the Acts of 1974. The word immediately before the bracketed language, in each case, was substituted by Ch. 448 of the Acts of 1975, and, for our purposes, effected no substantive alteration.

A companion statute, Va.Ann.Code § 6.1–330.33, contemporaneously enacted and reenacted in 1974 and 1975, prohibited any lender from collecting or receiving any prepayment penalty if prepayment should result from the enforcement of the right to call the loan upon the sale of the real property securing the loan.

8. For example, an unencumbered house might have a market value of $100,000. If it had an unexpired mortgage or deed of trust on it covering an outstanding unpaid balance of $50,000 payable over another 27 years at a rate of 10%, and that obligation could be transferred, in today's market that house would realize something in the neighborhood of $115,000, i. e. more than the property free and clear of all liens and encumbrances would bring.

It is no answer to that somewhat anomalous state of affairs that the person owning the house outright could also realize $115,000 by himself granting a purchase money mortgage or purchase money deed of trust at 10% for 27 years. The extension of such unrealistically favorable borrowing terms would represent an economic disadvantage here capable of evaluation at $15,000. The outright owner of his house who would have to impose *on himself* the $15,000 economic disadvantage would consequently be worse off than a couple who, were they able to effect a transfer of the loan, would be able to keep the entire $15,000, placing the economic disadvantage on a third party, the deed of trust lender. So, Mrs. Bailey and her co-appellants argue *for a result under which* they would be better off than a prudent couple who owned their home free and clear.

In the case of a property worth $100,000 if *totally unencumbered, which is subject to a* mortgage or deed of trust with 27 years still to run at an interest rate of 10% per annum, and the outstanding unpaid principal amounting to $50,000, let us assume that buyers would be willing to pay cash of $65,000, and either (a) assume the favorable 10% mortgage of $50,000, or (b), if they must, go into the current mortgage market and pay its equivalent. The equivalent, in approximate terms, would be a $35,000 27 year mortgage at 15%. (The monthly level payments on $50,000 at 10% per annum would be substantially the same as the monthly payments on $35,000 at 15%.)

Under the former procedure, the selling couple would net $65,000, since they would need pay nothing towards satisfaction of the deed of trust note (assuming no subsequent default by the buyers). Under the latter procedure, however, the deed of trust note would have to be satisfied in full. The application of the $35,000 in new borrowing would still leave unpaid $15,000 which would have to come out of the $65,000 so that the sellers would net $50,000.

Since the seller, for a $100,000 house, would be freed of an outstanding obligation of $50,000, and additionally receive $50,000 in cash, he *would be as well off economically as a* homeowner having title free and clear, and netting $100,000.

Mrs. Bailey's contentions, consequently, were *they to succeed, would yield to her not only* whatever profit inheres in the rise in the real

In the final analysis, one must conclude that people like Mrs. Bailey are simply too eager to shift to others burdens properly belonging on their own shoulders. Even if the due-on-sale clause is valid, and has been triggered, and Mrs. Bailey, must, therefore, accelerate and pay off the balance due on her deed of trust loan, she, nevertheless, has been a beneficiary economically, vis-à-vis the deed of trust lender, as a result of the borrowing. The effects of inflation have served to erode the real, as distinct from the face, value of money. Hence, paying off $53,903.63 borrowed in 1977 with $53,-903.63 of 1980 or 1981 dollars provides Mrs. Bailey with a tidy economic advantage.[9]

### I. *Sale, Conveyance or Transfer.*

The first thrust on behalf of appellants, in the jousting with the savings and loan association lenders, is a contention that the residential properties never were "sold or transferred," or "sold or conveyed" or that title was not "transferred."[10] Hence, the contention runs, the due-on-sale clauses have never, in fact, operated to accelerate the loans. Reliance is placed on the artificially elaborate form of the transactions employed for transferring title to the purchasers.

The transactions between Mrs. Bailey and the Williams began routinely enough. On November 7, 1979, Mrs. Bailey entered a typical form real estate contract containing terms of sale, and details as to settlement, brokerage commissions, and the like. Foreshadowing what was to come, however, the November 7, 1979 contract, in an addendum, described the subject of the sale as the beneficial interest in a land trust to be created by Mrs. Bailey.

That contract of November 7, 1979 was reinforced by one of the following day, November 8, 1979, called a "Contract to Purchase by Assignment the Beneficial Interest in a Land Trust Holding Real Estate." It called for Mrs. Bailey to name herself as trustee and to bring about a situation in which she, individually, and she, as trustee, between them would have "full and complete legal and equitable title ... without lien or encumbrance of any kind, except as noted in any Deed of Trust on the real estate ...."

No point has been made that those contracts, of themselves, operated to trigger the due-on-sale clause. We, therefore, do not address that question, which might not prove easy of resolution. On the one hand, the contracts did not affect possession, but only the right to possession, upon satisfaction of contingencies, especially meeting of the purchase price. On the other hand, equitable title in the Williams, whatever verbiage to the contrary may have been employed, was created by the contracts of November 7, 1979 and November 8, 1979. *See Bellingham First Federal Savings & Loan Association v. Garrison,* 87 Wash.2d 437, 439, 553 P.2d 1090, 1091 (1976) ("Thus the real estate contract executed by appellants and defendants is an 'inter vivos transfer' within the meaning of the [due-on-sale] clause."); *Mutual Federal Savings & Loan Association v. Wisconsin Wire*

---

estate market (in the world of today, it was to be expected that she and Mr. Bailey bought the house for less than the $79,903.63 which was the price at which she sold to the Williams. The purchase price was, in fact, $63,831.) It would also additionally confer on her an artificial profit attributable to the decline in value of the deed of trust loan. "What the seller is then selling is his mortgage rate, and not his property.... the mortgagor has already benefited from the loan terms, and providing the benefit of transferability of those terms in a pricing context ... is a windfall." Article, *Enforcement of Due-on-Transfer Clauses,* 13 Real Property, Probate and Trust Journal 891, 926, 930 (1978) (hereafter *"Enforcement"*). Yet the Baileys were not the investors, the risk takers, on the loan. Nothing in reason commends a rule which would lead to such a windfall.

9. As it happens, Mrs. Bailey enjoyed another advantage not vouch-safed to all home borrowers. First Federal Savings and Loan Association of Arlington had sold a 90% interest in her obligation to the FHLMC. Consequently, purchasers from her, if credit-worthy, could arrange assumption for a 1% assumption fee.

10. The assertion is made, mind you, despite the candid admission in Appellants' reply brief that: "Some Appellants, indeed, sold their 'principal residences' ... to other Appellants who use the residences as their 'homes.'"

*Works,* 58 Wis.2d 99, 105, 205 N.W.2d 762, 766 (1973) ("In view of common and technical usage of the term 'convey' and the purpose of the 'due-on-sale clause' of the mortgage and note, there is no ambiguity. The land contract was a conveyance that gave the purchaser an equitable title to the property as well as the immediate right to possession."). *See Terry v. Born,* 24 Wash. App. 652, 604 P.2d 504 (1979).

Rather, the argument of the lenders derives from the fact that Mrs. Bailey, on January 15, 1980, created a trust (secondary, of course, and subject to the 1977 security deed of trust), by means of a document entitled "Declaration and Deed into a Land Trust." Mrs. Bailey, individually, granted, bargained, and assigned to herself as Trustee the parcel in Springfield, Virginia "to have and to hold ... in fee simple ...." The Trustee's power to sell was conditioned on receipt of a consent to do so from the trust beneficiary. The Declaration and Deed into a Land Trust was recorded among the land records of Fairfax County, Virginia.

Mrs. Bailey, as Trustee, also on January 15, 1980, entered into a land trust agreement with herself, designating herself as sole beneficiary of the land trust, and providing that the property had to be sold within twenty years. Since, apart from the November 7, 1979 and November 8, 1979 contracts with the Williams, even without the January 15, 1980 agreement, only the 1977 security deed of trust stood between Mrs. Bailey and absolute title, legal and equitable, it may be questioned whether the agreement was other than a superfluity. *See Larchmont Homes, Inc. v. Annandale Water Co., supra,* 201 Va. at 181–82, 110 S.E.2d at 252. *Cf.* as to an analogous development re mortgages, 4 *Restatement, Property* § 415, Comment a (1944). The purpose, apparently was to effect a change in legal nomenclature so that all interests other than the 1977 deed of trust would be denominated personal property, not real property.

The conveyance to herself, creating the second trust, and the land trust agreement with herself, designating herself as sole beneficiary, the argument of appellants runs, were not contemplated by the terms of the due-on-sale clause. The due-on-sale clause was to become operative only in the event of a transfer of title. To appreciate the argument, one readily perceives that the title has not essentially been affected in any way by the second deed of trust, since beneficial interests of record remain exactly as they were before the January 15, 1980 deed of trust and the January 15, 1980 agreement were executed. Their sole effect, if any, was to transform from "real" to "personal" in the hands of Mrs. Bailey the rights to enjoy, occupy, and otherwise exercise rights of ownership associated with possession. To put it succinctly, there was formally a "conveyance" but substantively no "transfer."

The District Court, nevertheless, concluded that the mere change in the form of the title, accomplished as it was by "grant, bargain and sale" triggered the due-on-sale clause. Since no substantial change was accomplished we may have reservations about that conclusion, but it makes no matter.

For then came the ingenious next step in the transaction, one which Mrs. Bailey claims was a "transfer" but not a "conveyance." (Now you see it, now you don't.) Also on January 15, 1980, Mrs. Bailey executed an "Assignment of Beneficial Interest in Land Trust" undertaking to "*sell,* assign, *transfer, convey* and set over" all rights, power, privileges and beneficial interest, including all interest in the property, subordinate to the 1977 deed of trust for the benefit of First Federal Savings and Loan Association of Arlington, as lender. (Emphasis added.) That document manifestly encompassed all rights of enjoyment, occupancy, and use, in perpetuity.[11] However, appellants strive to place great reliance on the

---

11. Counsel for appellants has written a brochure describing what was assigned as "the

exclusive right to exercise the normal incidents of ownership."

consideration that the subject of the transfer was *personal* property.[12]

Of course, one must wonder, in the year of our Lord, One Thousand Nine Hundred and Eighty-One, what significance the maneuvering has had. The end result, with the Williams occupying the property, is essentially no different from the situation the Williams would have been in as purchasers in the customary real estate sales transaction. There can be no doubt that, had a customary real estate deed been employed to accomplish directly the essentially identical result reached by Mrs. Bailey's circuitous route, the due-on-sale clause would have been triggered.[13] If one travels by by-roads rather than use an interstate highway, but ends up at the same destination, the journey has nonetheless taken place. In their contract with the Williams, Mrs. Bailey has been designated: "Seller." [14]

That is where attempted ingenuity again enters the picture. Appellants argue that the due-on-sale clause goes into operation only in the event of a "conveyance" or a "transfer of title" of real estate. They point to instances where, using the words technically, for particular purposes, "conveyance" and "transfer of title" concern only transfer of full *legal*, or, at the very least, *equitable* title.[15] And if an interest in real estate is called personal property in one set of circumstances, what it is called, they assert, takes precedence over what it is for every purpose. Title to real property, they urge, cannot encompass an interest which is merely "personal." [16]

---

**12.** The argument derives from the provision in Va.Ann.Code § 55–17.1 governing creation of land trusts stating that the interest of a beneficiary of a land trust should "be deemed to be personal property." The language was added to the statute in 1975.

But such "deeming" could not, by the express terms of the statute be "construed . . . to affect any right which a creditor may otherwise have against a trustee or beneficiary. . . ."

**13.** The appellants frankly concede in their Brief that the Williams "now enjoy the structure as their home."

Indeed, it goes further than that. Paul D. Scanlon, Esq. and Paul D. Scanlon, Ltd., which we take to be a professional association controlled by him, not only argued for all appellants in the consolidated cases. Paul D. Scanlon, or his professional association, was a participant in the transactions leading up to the litigation, accepting fees from both buyer and seller in each case.

Counsel for appellants, therefore, can hardly fail to contend that he effectively produced, in return for his fees, a beneficial holding in the Williams, Mr. Nault, the Bittners and the Saltos, respectively, equal in substance to that which a customary real estate transaction involving purchase of a home would have provided.

**14.** The contract further incorporated into itself by reference the language of "a form contract" for "the sale and purchase of real estate, setting forth the terms and conditions of sale between the parties and warranties, covenants and conditions to be performed by the respective parties" provided only that the subject matter of the contract should be "THE BENEFICIAL INTEREST IN THE LAND TRUST HEREIN ABOVE MENTIONED."

In a purely conclusory way, manifestly not binding on the lender under the deed of trust, who was not a party to the contracts between Mrs. Bailey and the Williams, nor binding on the court as to what the contract in fact constituted or accomplished, the contract added: "The use of the attached contract form is for the convenience of the parties and is in no way to be interpreted as contemplating or intending that the parties are agreeing to sell or purchase a real estate interest, either legal or equitable." The plain fact is that the Williams did purchase an interest in real estate from Mrs. Bailey, whether or not, *as between themselves*, they might choose to treat it as personalty. Two of us may agree that the emperor is clothed, and are, therefore, estopped to deny that he is caparisoned cap-à-pie. A third party is nonetheless free to cry out the true fact that his imperial majesty is as naked as the day he was born.

**15.** *See Larchmont Homes, Inc. v. Annandale Water Co., supra*, 201 Va. at 181, 110 S.E.2d at 251 where the meaning of conveyance is discussed. Black's Law Dictionary is quoted:

In real property law. In the strict legal sense, a transfer of legal title to land. In the popular sense, and as generally used by lawyers, it denotes any transfer of title, legal or equitable. . . .

**16.** The argument has a fundamental frailty. Bouvier contains an enlightening discussion of the definition of "Title" derived from Blackstone:

There are several stages or degrees requisite to form a complete title to lands and tenements. The lowest and most imperfect degree of title is a *presumptive title* or the *mere possession*, or actual occupation of the

■ They then seek to build on that base by reliance on the argument that, in cases of ambiguity, the ambiguity shall be resolved against the preparer of the document, especially one possessing special knowledge,[17] and especially when the document derogates against the common law right of free alienation.[18] While it is true that *ambiguities* are resolved against the party preparing the contract, *Baird v. Dodson Bros. Exterminating Co., Inc.*, 217 Va. 745, 749, 232 S.E.2d 770, 773 (1977); *VNB Mortgage Corp. v. Lone Star Industries, Inc.*, 215 Va. 366, 371, 209 S.E.2d 909, 913 (1974), where a document is clear and unambiguous, the doctrine does not apply. *William Schluderberg-T. J. Kurdle Co. v. Trice*, 198 Va. 85, 88–89, 92 S.E.2d 374, 377 (1956); *see People's Bank of Rural Retreat v. People's National Bank of Abingdon*, 148 Va. 651, 659–60, 139 S.E. 325, 327 (1927).[19] Here, bearing in mind the nature of a transaction by which funds are lent to a home purchaser, there is no ambiguity. Thus, "sold," "conveyed," and "transferred" used in each of the deeds of trust clearly extended to the land trust transactions, toppling the house of cards.

■ The patent error of appellants is their effort to isolate each instrument and say that it, by itself, is not a conveyance of beneficial interests, or not a deed to real estate, so no single document fitting the due-on-sale clause definition exists. It is, however, no more than if appellants were to say that ⅓ is not 1, when one is the requisite number. While the statement may be

estate, without any apparent right to hold or continue such possession .... The next step to a good and perfect title is the *right of possession*, which may reside in one man while the actual possession is not in himself, but in another.
2 Bouvier's Law Dictionary, p. 3281 (8th ed. 1914) (emphasis in original).
Thus a couple such as the Williams had a kind of title, however it was denominated, since they had the full right of occupancy or possession.
Indeed, it should be noted that what reliance appellants place in the word "title" is confined exclusively to the Boyd-Fairfax Savings and Loan Association deed of trust. There the due-on-sale clause operates if the "title is transferred." As to the others, the controlling language is "Property or an interest therein is sold or transferred," or "property is sold or conveyed." In each of those cases, the property, irrespective of whether it was real property or personal property, was unmistakably "sold." *Cf. Chapman v. Ford*, 246 Md. 42, 46, 227 A.2d 26, 27 (1967), holding that an oral agreement, unenforceable under the statute of frauds, constituted a sale for purposes of a provision reading: "in the event the Mortgagors sell the property hereby mortgaged ...."
Of course, over and beyond its other defects, the improbability of the reading advocated by appellants is fatal. In choosing language to create "uniform covenants for national use ... to constitute a uniform security instrument covering real property," the federal agencies never intended that the transfers with which we are here concerned should be entirely free of the due-on-sale clause. Such an interpretation would obliterate the uniformity sought.
Nor is it an answer for appellants to point to the language of the FNMA–FHLMC deed of trust form reading: "This Deed of Trust shall be governed by the laws of the jurisdiction in which the Property is located." Apart from the restraint on alienation and antitrust contentions which we shall hereafter demonstrate to be unfounded, there is nothing in Virginia law which would preclude a definition of "sale," "conveyance," or "transfer" so as to reach the land trust transactions entered among the appellants. We find as a matter of construction that the due-on-sale clauses in all of the consolidated cases were triggered.

17. *Cf.* the rule that insurance policies will be construed most strictly against the insurer. 17 Am.Jur.2d § 276, p. 690 (1972); 4 Williston *On Contracts*, § 621, pp. 764–72 (3d ed. 1961).

18. As restraints on alienation are not favored, conditions against alienation are strictly construed, and, even if they would otherwise be valid, are ineffectual unless certainly and clearly expressed. 61 Am.Jur.2d § 96 at 94 (1972). However, as we shall later elaborate, there is here no forbidden restraint on alienation.

19. *See* 17 Am.Jur.2d § 276, p. 691 (1972):
These principles apply only where a contract is open to more than one reasonable construction, and should not be applied to reach an unreasonable construction in defiance of the terms of the contract, or to overturn the intention of the parties when it is clearly manifest from the entire contract. Furthermore, the rule that expressions will be interpreted against the party selecting and using them applies only where, after the ordinary rules of construction have been applied, the agreement is still ambiguous. (Footnotes omitted).

true so far as it goes, the production of three ⅓s will serve, and that is all that has happened here. Putting the numerous papers all together they, as part of a single, integrated transaction, accomplish a "sale," a "conveyance," or a "transfer" within the meaning of the due-on-sale clause. After all was said and done, Mrs. Bailey no longer owned and occupied the Springfield, Virginia property. Equally, when it was all over, the Williams did.[20] The due-on-sale clause therefore operated and required appellants to satisfy in full the accelerated loans secured by the security deeds of trust.[21]

## II. Lien or Encumbrance

■ Elaborateness having failed, appellants turn to simplicity itself. They point to the FNMA–FHLMC deed of trust language excluding a lien or encumbrance subordinate to the deed of trust from the operation of the due-on-sale clause. The deed of trust note, it is true, comes ahead of any possessory interests or rights of enjoyment, whether held by Mrs. Bailey as grantor or the Williams as grantees, taking precedence in the event of default. Every interest is subordinate to the deed of trust. It is a *first* lien.

The simple argument has a simple answer. While subordinate to the deed of trust, the right to "enjoy the structure as their home" was not a "lien or encumbrance." It was not for the purpose of securing an obligation. The deed of trust in favor of First Federal Savings and Loan Association of Arlington securing the note was a lien or encumbrance; the interests of the Williams were not. Rather, in every realistic sense, their interest, regardless of whether, for some purposes, it was real or personal property, was a fee simple, i. e. beneficial, ownership, subject to the security interest created by the first deed of trust securing the note to First Federal Savings and Loan Association of Arlington.[22]

The overly broad meaning which the appellants seek to attach to "lien and encumbrance" would encompass any interest created in the property. It thereby would cause what was clearly meant as a limited exclusion from the due-on-sale clause applicable in a few cases only to expand so hugely as to swallow-up and extinguish altogether the due-on-sale clause itself. That argument, consequently, fails.

**20.** In construction of a contract, the purpose of the contract is more important than the academic definition of the words used. *Krikorian v. Dailey*, 171 Va. 16, 197 S.E. 442 (1938).

**21.** In another context, Dean, later Solicitor General, Erwin N. Griswold, impressive teacher and distinguished lawyer, used a telling phrase to deal with situations, in the federal tax area, in which practitioners, by exalting the formality of words over their true substance, would seek to obtain unwarranted, unreasonable, and unfair advantages. The cases would inevitably be lost, to the infinite disgust of the ingenious practitioners. Dean Erwin N. Griswold called them "You think you're smart cases." *See, e. g., Gregory v. Helvering*, 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935):

Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character . . . .

In these circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted according to the terms of

subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality . . . .

**22.** A beneficial ownership interest is not an encumbrance. *See, e. g.,* Annotated Code of Virginia § 8.9–105(g): " 'Encumbrance' includes real estate mortgages and other rights in real estate *that are not ownership interests*;" (Emphasis added).

Appellants do not appear to contend that the beneficial ownership interests are a "lien." They are right not to do so. While that term is capable of a variety of uses, here it evidently signifies the customary meaning: "a claim . . . upon the property . . . as a security for some debt or charge." 2 Bouvier's Law Dictionary, p. 1978. Again, beneficial ownership interests are not encompassed within the word "lien."

In sum, the rights to beneficial ownership, possession, and enjoyment fall outside the concept of "lien or encumbrance."

In fact, the exception from the triggering of a due-on-sale clause when a subordinated lien or encumbrance was imposed on the property was a requirement of the FHLBB included in its overall authorization of the due-on-sale clause.[23] It is absurd to think, as appellants argue, that the provision was meant to take away completely with one hand what the Bank Board was plainly conferring with the other.[24]

### III. Restraint on Alienation

There remain for consideration restraint on alienation and Virginia antitrust attacks launched against the deed of trust in the FNMA–FHLMC form between the Potes, as borrowers, and Washington-Lee Savings and Loan Association (as successor to Atlantic Mortgage Company Division of NBD Mortgage Company), as lender. We turn first to the restraint on alienation contention.[25]

**23.** The authorization reads:

An association continues to have the power to include, as a matter of contract between it and the borrower, a provision in its loan instrument whereby the association may, at its option, declare immediately due and payable sums secured by the association's security instrument if all or any part of the real property securing the loan is sold or transferred by the borrower without the association's prior written consent.

12 C.F.R. § 545.8–3(f) (formerly 12 C.F.R. § 545.6–11(f)).

However, the regulations in 12 C.F.R. § 545.-8–3(g) go on to prohibit exercise of a due-on-sale clause as a consequence of "creation of a lien or other encumbrance subordinate to the association's security instrument."

**24.** Appellants appear to have abandoned a final argument asserted in their complaint: "Finally, Plaintiff Beneficiaries are 'assigns' of Mortgagors per ¶ 15 (sic) of the deed of trust. (Presumably the reference was intended to be ¶ 13)." In all events the contention is totally unpersuasive. The assignment provisions of the deed of trust explicitly state that they are "subject to the provisions of paragraph 17 hereof." Paragraph 17 contains the due-on-sale clause.

**25.** Appellants' counsel traces the origins of the legal concept outlawing unreasonable restraints on alienation to the 1290 Statute *Quia Emptores*, the Statute of Westminster, 18 Edw. I. ch. 1. That statute, eliminating the feudal

At the outset we mention, but pass by, the possibility that the Federal government, through appropriate actions of Congress and the proper administrative agency or agencies, has fully preempted, pursuant to the Supremacy Clause, Art. VI, Clause 2 of the United States Constitution, any state regulation of due-on-sale clauses in the loan instruments of federal associations. *Glendale Federal Savings and Loan Association v. Fox*, 459 F.Supp. 903 (C.D.Cal.1978), *partial summary judgment made final*, 481 F.Supp. 616 (C.D.Cal.1979); *see also Meyers v. Beverly Hills Federal Savings and Loan Association*, 499 F.2d 1145 (9th Cir. 1974); *First Federal Savings and Loan Association of Boston v. Greenwald*, 591 F.2d 417 (1st Cir. 1979); *Conference of Federal Savings and Loan Associations v. Stein*, 604 F.2d 1256 (9th Cir. 1979), *aff'd mem.*, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980). The Court in *Glendale* held that federal law, and specifically the FHLBB's autho-

relationship of the feoffee to all mesne lords beneath the king, and limiting to the king the right to impose restraints on alienation, is only of historical interest. There has been little occasion to invoke the statute in the United States, because of the allodial nature of holdings in this country. 28 Am.Jur.2d pp. 74–75 (Estates § 4). Tenure in Virginia is allodial. 1 Minor, *Real Property*, § 16 (2d ed. 1928).

In considering the due-on-sale clause it merits remembering that it is "imposed" not by a predecessor in the homeowner's chain of title—a mesne landlord, but by a collateral lender concerned with security for its loan. *Quia Emptores* hardly seems to extend to such matters.

Nevertheless, regardless of the source, there is a general rule forbidding the fettering of rights of ownership so as to permit someone else to control its alienation or use. 61 Am. Jur.2d p. 108 (Perpetuities and Restraints on Alienation, § 100). At the same time, a limited and reasonable restraint on the power of alienation may be valid. *Id.* p. 111, § 102. For our purposes, we need not finally determine whether there is no restraint of alienation at all. The result will not differ, should we conclude that there was no restraint, or should we determine that, if there be restraint, it is reasonable. Application of the doctrine outlawing unreasonable restraints *does not appear to turn on* whether the relation of the person creating or enjoying the restraint is in the direct line of title, or a collateral one.

rization, through 12 C.F.R. § 545.6–11(f),[26] of due-on-sale clauses, exclusively governed. California law, the Court concluded, was "inapplicable to Glendale Federal's loan instruments executed on and after June 8, 1976." *Id.* at 912. To like effect, *Conference of Federal Savings and Loan Associations v. Stein,* 495 F.Supp. 12 (E.D.Cal. 1979), *appeal pending; Bailey v. First Federal Savings and Loan Association of Ottawa,* 467 F.Supp. 1139 (C.D.Ill.1979).

We pass that simple manner of disposing of the case for several reasons. We by no means wish to intimate that such a solution would be improper, or that, under preemptive federal law, the due-on-sale clause would not be fully operative. Rather, as the case has been presented to us, there would be too many uncertainties, or assumptions necessitated by absence of proof to justify that route. There is another, better marked path which leads to the same result.

The uncertainties as to preemption by federal law are several:

1. The preemption is more evident when the lender is a federally chartered association. While the federal connections of Washington-Lee Savings and Loan Association are, from appellants' own pleading, evidently substantial, and while the FNMA–FHLMC Uniform Instrument has been employed, still the association is state chartered, and possibly complex questions arise

over preemption insofar as its lending activities are concerned. The uncertainty is in no way minimized when one realizes that the original lender, Atlantic Mortgage Company Division of NBD Mortgage Company, as far as the record discloses, had no federal charter or other federal status.

2. The deed of trust was entered on March 15, 1976, prior to June 8, 1976, the effective date of the due-on-sale clause regulations of the FHLBB. There is authority that preemption and associated validation of due-on-sale clauses were extant even prior to June 8, 1976,[27] although the court in *Glendale* was careful to observe that the "contention is not before the court on this motion, and the court expresses no view as to its merit." *Glendale, supra,* 459 F.Supp. at 907.

3. Whatever the power to preempt may be or may have been, it seems probable that the FHLBB has not sought, in the Virginia denominated FNMA–FHLMC Uniform Instrument form of June 1975 employed in the Pote transaction, to impose on the states conditions with respect to mortgages or deeds of trust which would be in violation of state law. As previously pointed out, the FNMA–FHLMC deed of trust formulated for Virginia transactions specifically makes controlling the law of the jurisdiction in which the property is located.[28]

It seems at least questionable that the FHLBB intention was to render entirely

---

26. Recodified in 1980 at 12 C.F.R. § 545.8–3(f).

27. *See Conference of Federal Savings and Loan Associations v. Stein, supra,* 495 F.Supp. at 17:
    California law with respect to the validity and exercisability of due-on-sale clauses in the loan instruments of the plaintiff Federal associations is inapplicable whether such instruments were executed before or after the effective date of 12 C.F.R. § 545.6–11(f) and (g).
    *See also, Bailey v. First Federal Savings and Loan Association of Ottawa,* 467 F.Supp. 1139 (D.C. C.D. Ill.1979).

28. We are fortunately spared the complications associated with what to do where a due-on-sale clause is valid under federal law, but in a particular case leads to a result which state law would disallow as inequitable. *See First Federal Savings and Loan Association of Englewood v. Lockwood,* 385 So.2d 156, 160 (Fla.App. 1980) ("The true issue before us is not whether a due-on-sale clause may be authorized or even required in a federal association mortgage instrument, but whether the due-on-sale clause must be automatically enforced by a state court without regard to traditional principles of equity. . . . We answer the question by stating that a plaintiff who initiates a suit in equity must be subject to *all* of the applicable consequences of that action and not merely those to which he chooses to submit."). *Cf. Tucker v. Pulaski Federal Savings & Loan Association,* 252 Ark. 849, 853, 481 S.W.2d 725, 728 (1972) (". . . appellee cannot, simply on the basis of the quoted clause, accelerate the note. . . . This procedure cannot be countenanced in a court of equity."). Of course, the election of the Potes and the Saltos to initiate the action in federal, rather than state, court weakens their posture on that point.

    However, it is of no significance in any event, since we conclude that the due-on-sale clause is valid and enforceable in the Potes case under

irrelevant provisions of Virginia law governing the legality or illegality of due-on-sale clauses. The form here employed, obviously meant to conform to FHLBB requirements, scrupulously abides by the requirement of Va.Ann.Code § 6.1–330.34 that, if a deed of trust contains an acceleration of payment upon sale or conveyance clause (i. e. a due-on-sale clause), it shall prominently display the legend: "NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED."

The Virginia prohibition in Va.Ann.Code § 6.1–330.33 of any prepayment penalty where the homeowner must pay off the loan by virtue of the lender's "enforcement of the right to call the loan upon the sale of the real property which secures said loan" is paralleled by the FHLBB regulation 12 C.F.R. § 545.8–3(g)(2) forbidding "a prepayment charge or equivalent fee for acceleration of the loan by exercise of a due-on-sale clause."

■ Therefore, putting to one side the preemption question, we proceed to inquire whether an inappropriate restraint on alienation, under Virginia law, exists. To do that properly, we must range beyond the specific question of the due-on-sale clause itself. Viewed in isolation, it cannot be said to create a restraint on alienation,[29] or if it

---

Virginia law. Similarly, it, therefore, is not necessary to explore the possibility that the deed of trust language means "the law of the state in which the property is located *as preempted or supplemented by federal law.*" *Great Western Union Federal Savings and Loan Association v. Walters,* U.S.D.C. W.D. Wash. No. C–79–906V, June 18, 1980 (emphasis supplied).

**29.** *Occidental Savings and Loan Association v. Venco Partnership,* 206 Neb. 469, 471, 293 N.W.2d 843, 845 (1980) ("An examination of the law pertaining to restraints on alienation makes it clear that a 'due-on-sale' clause is not a restraint on alienation and cannot be so considered for any purpose, theoretical or practical.") The due-on-sale clause, standing by itself, can hardly be a restraint on alienation. In the first place, its effect is to remove a lien or encumbrance—namely the security deed of trust—and thereby render the parcel of land more alienable—not less. Moreover, and perhaps more importantly, the homeowner whose property is subject to a due-on-sale clause is as free to sell, and, in selling, to realize as much as a homeowner holding the same property free and clear of any encumbrance. *See* note 8, *supra. Cf. "Enforcement," supra,* at 926:

To label the loss of a purported favorable economic position as a restraint on alienation is a misconception of that doctrine, which was not intended to provide profitability of alienation, but only the ability to alienate without penalty.

The point is tellingly made by Justice Clark dissenting in *Wellenkamp v. Bank of America,* 21 Cal.3d 943, 954, 148 Cal.Rptr. 379, 386, 582 P.2d 970, 977 (1978):

Additionally, the majority opinion awards the owner of the encumbered real property a bonus in that he can now sell his property for something in excess of what he could sell it for if unencumbered.

We have thus come full circle. In attempting to take away contractual rights of lenders in order to assist borrowers in selling encumbered properties, the majority opinion has devised a scheme which affords yesterday's borrower a clear advantage over today's seller who comes to the marketplace with his property free from encumbrance.

The majority's attempted rebuttal reads (21 Cal.3d at 951, 148 Cal.Rptr. at 384 n.7, 582 P.2d at 975 n.7):

The argument of the dissent—that our holding places the seller of encumbered real property at a "competitive advantage" over the seller of unencumbered real property in periods of rising interest and tight money—simply misses the point. The fact that market conditions may operate to hamper the sale of some real property during such periods certainly cannot be held to justify the hampering of all such sales regardless of whatever financing arrangements may be outstanding against such property. Sellers of unencumbered real property have presumably benefited from lower interest rates in achieving their position. To require sellers of encumbered real property, who have not enjoyed this benefit, to suffer from market contingencies along with those who have, is to take a very narrow view of "competitive advantage." In any event we here concern ourselves with the effect of due-on provisions in the sale of properties subject to existing financing—not with the effect of market conditions upon properties *not subject to* existing financing.

The dissent exposes that combination of non-sequitur and unsupported assumptions for

does, it is one validated by the Virginia legislature.[30]

The due-on-sale clause is but one piece in a larger puzzle. A loan obtained to finance in part the purchase of one's home, for which one has given security in the form of a deed of trust or mortgage, has a variety of facets. Initially, it is viewed as an arrangement which will run its full course, here 30 years. So long as the homeowner continues to own and occupy the house, he is interested in the protection against call, in the preservation of his right not to pay more than the level monthly payment fixed at the outset, and contemplated to remain constant during the whole 360 month period.

what it is (21 Cal.3d at 957, 148 Cal.Rptr. at 388 n.3, 582 P.2d at 979 n.3):

The majority cling to the thesis that its decision today serves to eliminate restraints on alienation. However, in footnote 7 (*ante*, p. 951 [of 21 Cal.3d, 148 Cal.Rptr. at 384, 582 P.2d at 975]) it concedes its concern *only* for properties with existing financing to the disadvantage of unencumbered properties, when such properties are competing on the same market. In an attempt to justify its lack of equal concerns, it argues that sellers of unencumbered real property "have presumably benefitted (sic) from lower interest rates in achieving their position," and now such advantage should be balanced in favor of those who have not benefited (sic), they being the sellers of encumbered real property. The presumption by the majority is completely gratuitous—nothing in the record nor in sound reason supports it.

See *"Enforcement," supra*, at 926:

This logic problem is cogently noted in Mr. Justice Clark's dissenting opinion in *Wellenkamp* (Cal.).

To make the point in another way, consider that the due-on-sale clause does not preclude, forbid, or deter sale of the property free and clear at any time. It concerns instead only the time when the borrower must pay his obligation. It could hardly be seriously contended that, if a loan secured by a deed of trust to provide funds to purchase a house were, *from the outset* payable on demand, it would amount to an unreasonable restraint of alienation. So how can it be an unreasonable restraint of alienation for the loan to be payable on demand under some conditions (in case of sale), and payable at fixed period intervals under other conditions (in case of continued ownership and occupancy)? The loan is on terms more favorable to the borrowers than a totally demand loan would be, or the terms of a variable interest rate deed of trust, which a demand deed of trust in important particulars strongly resembles. Correspondingly, "[t]he economic effect of the variable interest rate mortgage and the exercise of the due-on clause to achieve an interest rate increase cannot be vastly different. *"Enforcement," supra*, at 930. The Potes seek to convert an advantage obtained by them when they first borrowed to buy the house, which there was no legal obligation for the lender to provide, into an even greater advantage.

What the Potes argue is that, when they *acquired the property*, they should have been granted a better deal, allowing full rights to maintain the full 30 year term status of the loan, despite a change in the home ownership. The economics, if the loan agreement so provided, certainly, as long as conditions of rising interest rates continue, would then have been more attractive to the home buyer. On that reasoning, however, to call the due-on-sale clause a restraint on a subsequent alienation would logically constitute the use of 10% as the annual interest rate, instead of 7%, or 6%, or, indeed, any interest rate, an unreasonable restraint on alienation, as would, in fact, the requirement that the principal of the loan ever be repaid. The subsequent sale will be less attractive if the loan must be met.

See *"Enforcement," supra*, at 926:

The reduction of the purchase price brought about by the increase of interest rate should do nothing more than reduce the price of the property to that market rate commanded by similar properties which are not encumbered. The seller must use the favorable mortgage rate as a factor in establishing the price of the property, in excess of that available for unencumbered property. Thus, the reduction in price is nothing more than the loss of a "premium" engendered by the mortgage rate.

It is simply a misperception to eviscerate, as the California majority in *Wellenkamp* appears ready to eviscerate, as a restraint on alienation, a clause that only precludes the homeowner from realizing an additional and unbargained for economic advantage because interest rates have risen since the time when he secured, by mortgage or deed of trust, his promise to repay what he borrowed.

Cf. *Nichols v. Ann Arbor Federal Savings and Loan Association*, 73 Mich.App. 163, 165, 250 N.W.2d 804, 805 (1977), another case where the court decided that its disenchantment with a due-on-sale clause was so great that it would be invalidated, although with a reluctant acknowledgment that "the due-on-sale clause in question does not fit within the definition of a restraint on alienation found in the *Restatement of the Law of Property*."

30. Such is the inescapable effect of Va.Ann. Code § 6.1–330.33 and 330.34, *supra*, note 7.

But, as time marches on, things may, and frequently do change. Leaving aside, for the moment, the problems associated with changing interest rates, the homeowner may decide to move, preferring another house, or having been transferred by an employer to another part of the country. He wants to sell. Sometimes ineptly drawn mortgages or deeds of trust make it a breach of contract to sell without the prior consent of the lender.[31] The need to obtain the prior consent of another is a text-book example of an unreasonable restraint on alienation.

In such a situation, while the due-on-sale clause may not be directly involved, still there is something amiss in the total scheme for dealing with any acceleration[32] of the otherwise anticipated 30 year obligation. Whenever the thing that is wrong represents an attempted unfair advantage to the lender, the courts, not just in Virginia, but throughout the United States, seek to achieve justice by denying to the usually economically superior lender, with presumably the better bargaining position, other advantages in the package of provisions in the deed of trust concerning acceleration.

Two lower court Virginia cases illustrate the point:

1. *Best v. United Virginia Bank/National,* in the Circuit Court of Fairfax County, in Chancery, No. 58379, decree dated February 22, 1979. There a deed of trust executed September 25, 1972 contained a flat undertaking by the maker of the note that he would "not assign or transfer the property secured by this deed of trust without prior approval of the noteholder." The deed of trust called for automatic acceleration of the full principal upon breach of that covenant. The Chancellor ruled that there was a restraint on alienation, and that it was unreasonable, explicitly pointing out, however, that if the lender had "wanted to reserve the right to increase the interest rate ... the parties could have contracted for such a provision...." An appeal to the Virginia Supreme Court is currently pending.

2. *Iron Castle Associates v. Wood,* in the Circuit Court of the City of Richmond, Chancery No. G–4808–2, decree dated February 26, 1981. In 1972, a deed of trust was placed on the property as security for part of the sales price. There was a covenant by grantors: "that they will not transfer the title to the property so long as this deed of trust remains in full force and effect, without the consent of the holder or holders of the two notes, which consent shall not be unreasonably withheld."

Both cases, consequently, involved a flat restraint on alienation.[33] Furthermore, the

---

**31.** Even if the only penalty expressed for such a default is the creation of a right to accelerate and to compel repayment in full of the deed of trust note, the imposition in the contemplation of the law is unreasonable. A person should not be placed in a position in which he or she must violate an agreement, must dishonor his promise, to achieve a result.

**32.** Usually the acceleration is considered a "call" if initiated by the lender, and "prepayment" if brought about by the borrower.

**33.** Other prohibition of sale without consent of the lender cases include: *Sanders v. Hicks,* 317 So.2d 61, 62–63 (Miss.1975) ("The within property shall not be sold or encumbered without the express written consent of the within mortgagees, or their assigns."); *First Federal Savings and Loan Association of Englewood v. Lockwood,* 385 So.2d 156, 157 (Fla.App.1980) ("No conveyance of said property, or any part thereof, shall be made by Mortgagor without the written consent of Mortgagee."). *Cf. First*

*Southern Federal Savings and Loan Association v. Britton,* 345 So.2d 300, 301 (Ala.Civ., App.1977) ("The particular clause ... is as follows: '... The Mortgagor shall not sell or transfer title ... without the written approval of the Mortgagee, and any violation ... shall constitute a default ... and, at the option of the Mortgagee, all amounts secured by this mortgage shall become due and payable.' "); *Clark v. Lachenmeier,* 237 So.2d 583, 584 (Fla. App.1970) ("It is hereby agreed that in the event of transfer of ownership ... the Mortgagee has the right and privilege of accepting or rejecting ... such successor in ownership."); *Terry v. Born,* 24 Wash.App. 652, 653, 604 P.2d 504, 505 (1979) ("The contract ... was 'not assignable nor [could] the buyer convey the property without the seller's written consent.' "). *But see Baker v. Loves Park Savings and Loan Association,* 61 Ill.2d 119, 121, 333 N.E.2d 1, 2 (1975) (Although the mortgage flatly prohibited a sale, assignment or transfer of any right, title or interest without the prior

deed of trust in each case antedated the 1974 enactment of Va.Ann.Code §§ 6.1–330.33 and .34.

The lenders are not favored creatures of the law, at least as compared to borrowers. They must dot the "i"s and cross the "t"s. The due-on-sale clause sometimes evokes strong feelings. *E. g.* the dissent in *Crockett v. First Federal Savings and Loan Association of Charlotte*, 289 N.Car. 620, 224 S.E.2d 580 (1976), where the language used includes: "a loan shark's trap for the unwary borrower," 289 N.Car. at 634, 224 S.E.2d at 589, and "sheer extortion," 289 N.Car. at 642, 224 S.E.2d at 594.

If the interest rates go much higher, the legal profession may have to cede to lenders precedence in Shakespeare's trenchant line: "The first thing we do, let's kill all the lawyers." [34]

Nevertheless, the lenders have legal rights, too. If they have complied with all requirements of the law, they are entitled to enforce their due-on-sale clauses, for they are simply not restraints on alienation.

In the economics of the moment, the most evident target is obviously the right of the lender to call when, interest rates having risen, it is to its advantage to terminate the loan, and relend the accelerated principal at better rates.[35] It is in such contexts of something elsewhere rotten in the State of Denmark that lenders have been denied the right to activate due-on-sale clauses.[36]

written consent of the mortgagee, the prohibition was, nevertheless, upheld as a reasonable restraint on alienation, justifying an increase in the interest rate, a sanction for default provided in the mortgage in addition to the right to call the loan.)

**34.** Such an attitude no doubt underlies a tendency to deny the advantages of a due-on-sale clause to a lender, on the grounds that the prospect of an acceleration upon sale was disguised, or at least not clearly revealed to the borrower. *First Southern Federal Savings & Loan Association of Mobile v. Britton*, 345 So.2d 300, 303–04 (Ala.Civ.App.1977) ("We do not say that the mortgagee may not specifically contract for the option to accelerate in the event of sale unless the purchaser agrees to payment of increased interest up to the current rate at time of assumption of the unpaid mortgage balance. We do hold that such purpose may not be hidden behind a clause which is assumed to only provide protection for the security. If the clause is to be used to advance the financial interest of the lender ... an increase in the interest rate, such purpose must be openly stated and bargained for.... If the condition ... may be hidden ..., the mortgagor will be at the mercy of the mortgagee.") That decision of the Court of Civil Appeals of Alabama was held by the Alabama Supreme Court to be in error. *Tierce v. APS Co.*, 382 So.2d 485, 487 (Ala.1979). *Cf. "Enforcement," supra*, at 927.

In Virginia, however, any judicial concern on that score is stilled by Va.Ann.Code § 6.1–330.-34. *Cf. "Enforcement," supra*, at 932:

To the extent that the lack of statement of this underlying purpose of the due-on clause is interposed to bar enforcement for the purpose of increasing interest rate, the now widely used FNMA/FHLMC Uniform Mortgage Instrument attempts to provide a clear statement of this purpose.

**35.** What goes up must, of course, ultimately come down. At some time, interest rates may fall. Within the living memory of man, mortgage interest rates have been as low as 5%, and just possibly may, in time, return to such a level. In such circumstances, the homeowner would want acceleration of the loan in case he should sell. With rates declining, say, to 5% as against the 8.5% called for in the Pote deed of trust note of March 15, 1976, no punishment to the lender would result from invalidation of the due-on-sale clause, because there existed a requirement of consent from the lender before any sale could properly be made. Generally (absent an unusual risk to the stability of the security) the lender would be happy to have the deed of trust assumed by a purchaser, with no acceleration, in view of the favorable interest rate. Thus, where interest rates have fallen, it would be the prohibition on sale without consent itself which the homeowner would be interested in seeing invalidated.

If acceleration upon sale were not permitted to the homeowner in an atmosphere of declining interest rates (or if he could accelerate only upon the payment of a substantial premium or penalty), the homeowner would be placed in a situation where he could not sell on as favorable terms as would be the case if he were an owner of his premises free and clear of the lien or encumbrance of a deed of trust. As already observed, that disadvantage manifestly is a restraint on alienation. *See Iron Castle Associates v. Wood, supra; Best, supra.*

**36.** Related to the results where there is something amiss, are similar results achieved by narrowly limited interpretation where the deed of trust contains language indicating an understanding of the parties that the due-on-sale clause was intended *only as a protection of the lender's security interest.* Sometimes the se-

That, should not, however, be confused with the situation where nothing else in the package is amiss. Then the due-on-sale

clause may be relied on by the lender.[37] There is nothing inherently unfair or unreasonable in such a rule. The reason making

curity instrument may remark that a purpose of the due-on-sale clause is to protect the lender's security. Applying *expressio unius est exclusio alterius,* courts have foreclosed resort to the due-on-sale clause absent a showing by the lender that the security would be impaired (not usually an easy burden since the selling homeowner remains obliged to pay the note, with the purchaser of the home, who assumes the debt, an additional obligor). *See Best, supra,* where a clause providing for acceleration in case of an unapproved sale was described as included in the deed of trust "in order more fully to protect the security of the Deed of Trust." *Cf. First Federal Savings and Loan Association of Englewood v. Lockwood, supra,* 385 So.2d at 159: "'It is the intent of this mortgage to secure payment of said note...' Thus, the sole purpose set out by First Federal deals with the protection of its security."

Other courts have taken the further questionable step of asserting that any purpose underlying the insistence by a lender on a due-on-sale clause save protection of the security (and in particular a purpose to protect against the adverse consequences of rising interest rates) is not permitted by law. *Wellenkamp v. Bank of America, supra,* 21 Cal.3d at 953, 148 Cal.Rptr. at 385–86, 582 P.2d at 976–77: "For the foregoing reasons, we hold that a due-on-sale clause contained in a promissory note or deed of trust cannot be enforced upon the occurrence of an outright sale unless the lender can demonstrate that enforcement is reasonably necessary to protect against impairment to its security or the risk of default." *See also Patton v. First Federal Savings and Loan Association of Phoenix,* 118 Ariz. 473, 478–79, 578 P.2d 152, 157–58 (1978) ("... we ... hold that the 'due on sale' clause cannot be enforced unless First Federal can show that its security is jeopardized by the transfer of the subject property...."); *Bellingham First Federal Savings & Loan Association v. Garrison, supra,* 87 Wash.2d at 441, 553 P.2d at 1092; Annotation, *Validity, Construction, and Application of Clause Entitling Mortgagee to Acceleration of Balance Due in Case of Conveyance or Transfer of Mortgaged Property,* 69 A.L.R.3d 713, 749–50 (1976).

No Virginia case has so held, and such a decision would be difficult to sustain in light of Article I, Section 1 of the Virginia Constitution (the Bill of Rights); *cf. Young v. Commonwealth,* 101 Va. 853, 45 S.E. 327 (1903).

Nor has any Virginia case reasoned that, unless the document expressly spells out a particular reason for the inclusion of the due-on-sale clause (i. e., here, the right to minimize the adverse consequences of rises in interest rates), it is to be deemed that no such purpose for the clause was intended by the parties. (For exam-

ple, contrast an intermediate appellate court in New York which has held that the failure to state in the mortgage, as the purpose of the due-on-sale clause, the wish to raise the interest rate, to protect against market fluctuation, precludes exercise of a due-on-sale clause when that indeed is the only purpose. *Silver v. Rochester Savings Bank,* 73 App.Div.2d 81, 424 N.Y. S.2d 945 (1980) (mortgage provided mortgagee would not unreasonably withhold consent to a sale.)) Under the FNMA/FHLMC uniform deed of trust, that "interpretation" would be too forced. The Potes' deed of trust permits the due-on-sale clause to operate "[i]f all or any part of the Property or an interest therein is sold or transferred ..." except for four specific cases, none of which is applicable here: (i) subordinate lien or encumbrance, (ii) security for household appliances, (iii) succession by one life tenant on the death of another, and (iv) leasehold interest of less than three years. The interest rate fluctuation is evidently a, indeed *the,* principal underlying characteristic of home lending activities which leads lenders to insist on due-on-sale clauses. *"Enforcement," supra,* at 896–97 ("... whatever the traditional purpose of a due-on clause, its modern purpose has been to relieve the lender of low-interest rate loans in its portfolio."). It cannot reasonably be held not to have been contemplated as a reason for the clause.

**37.** Such is the precise holding of the only Virginia authority which appears to be squarely on point. *Lipps v. First American Savings & Loan Association,* in the Circuit Court of Prince William County, Chancery No. 13246, decree dated March 19, 1980, appeal pending to the Supreme Court of Virginia. The court had before it a transaction which used the June 1975 FNMA–FHLMC Virginia Uniform Instrument. It held that a sale brought into operation the due-on-sale clause, conferring on the savings and loan association the right to accelerate. It further held that the due-on-sale clause was legal and enforceable and in accordance with the statutes of Virginia.

It is only the case's lack of finality because of the pending appeal which prevents us from giving preclusive effect in this matter of state law. However, for the reasons we have advanced, the case appears to have been rightly decided. *Cf. Fidelity Union Trust Co. v. Field,* 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940); *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940); *Six Companies of California v. Joint Highway Dist. No. 13,* 311 U.S. 180, 188, 61 S.Ct. 186, 188, 85 L.Ed. 114 (1940); *C.I.R. v. Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

it important that the loan should run its full 30 year course dissipates when the homeowner sells. Then, in the huge majority of the cases at least (lenders, at the outset, having advanced on the security of the house only a portion of the purchase price, a reduction in the principal having occurred through monthly payments from time of original purchase to time of sale, and a usual consequence of inflation being an increase in the value of the residence—Mrs. Bailey sold to the Williams for $79,903.63 premises for which she and her husband three years before had paid $63,831), the proceeds are available and adequate to meet the acceleration.

Inspecting the details of the Pote deed of trust reveals no flaws in facets related to acceleration in the due-on-sale clause or in clauses other than the due-on-sale clause.

It does not require the lender's consent to a sale. It only permits the lender, at its option, to exercise the due-on-sale clause if there has been a sale, which the Potes, as homeowners, are fully entitled to make without any dishonoring of their word. In case the due-on-sale clause is activated, the resulting acceleration may not give rise to any charge, premium or penalty.[38] There is none provided for in the Pote deed of trust in case of a call by the lender.[39]

As for a prepayment, not accompanying a sale, there is nothing about which the Potes were entitled to complain. A right to prepay in whole or in part at any time was specifically conferred in the note secured by the deed of trust. After the first 5 years of the life of the deed of trust, all or any part of the outstanding principal of the loan could be prepaid without any charge, premium, or penalty, regardless of the source of the funds used for prepayment. During the first 5 years, a charge, not to exceed 1% of the amount by which aggregate prepayments in any year were in excess of 20% of the original principal amount was collectible, if, but only if, the source of the prepayment funds was a lender to the Potes other than the note-holder (originally Atlantic Mortgage Company Division of NBD Mortgage Company, and, by succession, Washington-Lee Savings and Loan Association).[40]

Those penalties fell comfortably within the requirements of Va.Ann.Code § 6.1–

**38.** The FHLBB regulation, 12 C.F.R. § 545.8–3(g)(2), explicitly forbids "a prepayment charge or equivalent fee for acceleration of the loan by exercise of a due-on-sale clause."

Va.Ann.Code § 6.1–330.33 declares that "[n]o lender shall collect or receive any prepayment penalty on loans secured by real property ... if said prepayment results from the enforcement of the right to call the loan upon the sale of the real property which secures said loan."

**39.** *See Nichols v. Ann Arbor Federal Savings & Loan Association,* 73 Mich.App. 163, 250 N.W.2d 804 (1977). That case invalidated a due-on-sale clause, but in taking that action was careful to distinguish a North Carolina case, *Crockett v. First Federal Savings and Loan Association of Charlotte,* 289 N.C. 620, 224 S.E.2d 580 (1976), on the very grounds that "a mortgagor's ability to prepay without penalty and take advantage of declining interest rates supported a like ability on the part of the mortgagee to take advantage of interest rates in his favor." The note in *Nichols* imposed a penalty for prepayment.

In upholding a due-on-sale clause in *Crockett,* the North Carolina court read the financing documents as creating a right in the lender to accelerate at its option, in the event of a sale, but further creating a right in the borrower "to prepay whenever he chose and take advantage of lower interest rates in the market." *Crockett, supra,* 289 N.C. at 626, 224 S.E.2d at 585.

To the same effect is *Century Federal Savings and Loan Association of Bridgeton v. Van Glahn,* 144 N.J.Super. 48, 54, 364 A.2d 558, 562 (1976) ("This mortgage may be prepaid. Thus if, in this case, the interest rate had fallen, the borrower would have been privileged to refinance his debt elsewhere at the lower rate and pay off the loan. The borrower may repay the entire debt without penalty three years after the date of the mortgage, although slight penalties prior to that date are assessed.").

**40.** The maximum penalty for prepayment of the $44,000 Pote loan was, consequently, $352.00 (1% of $35,200, i. e. $44,000 less 20% or $8800). No evidence was adduced by appellants to suggest that the penalty was excessive, given the need for the lender to incur the expense of investigations and decisions preparatory to relending the prepayment. We cannot say simply from the figure of $352 itself, that it is excessive or otherwise unjust.

330.27 [41] in force when the deed of trust and note were executed on March 15, 1976.[42] That statute permitted a penalty of one percent of the entire unpaid principal balance (or $440) rather than the lesser amount of eighty percent thereof, to which the prepayment penalty allowed by the note is, in fact, limited.[43]

Even if the Pote deed of trust had transgressed the 1% limitation on prepayment penalties, that could hardly have been seized upon as a basis for invalidating the due-on-sale clause. The statute specifically provides that any prepayment penalty violative of it "shall be unenforceable as to the amount in excess of 1% of the unpaid principal balance." The specific dealing with the consequences of a breach of the statute forecloses the imposition of another, unspecified sanction. *Fourth National Bank of N.Y. v. Francklyn*, 120 U.S. 747, 756, 7 S.Ct. 757, 762, 30 L.Ed. 825 (1887):

'The liability and the remedy were created by the same statute. This being so, the remedy provided is exclusive of all others. A general liability created by statute, without a remedy, may be enforced by common law action. But where the provision for the liability is coupled with a provision for a special remedy, that remedy, and that alone, must be employed.'

Thus, the due-on-sale clause became available to the lender upon the Potes' sale to the Saltos.[44]

### IV. Antitrust Law Contention

■ Finally, we must briefly attend to the attenuated argument that a due-on-sale clause, without more, *ipso facto* violates the Virginia antitrust law.[45] In the first place, there is no evidence of any kind to suggest that adoption of the due-on-sale clause by the lenders to the Potes proceeded from a conspiracy or other combination. Each home lender, acting on its own, was quite capable of perceiving the benefits to it flowing from the due-on-sale clause and of

---

**41.** A 1979 amendment, renumbered § 6.1–330.-27.1 made no changes of significance for the purposes with which we are concerned.

**42.** By reason of § 6.1–330.29, the effective penalty rate might have been 2% of any prepayment. See the Addendum to Note and Deed of Trust between Mrs. Bailey and First Federal Savings and Loan Association, providing for 2% in the first 3 years and 1% in the fourth and fifth year.

**43.** *Cf.* 12 C.F.R. § 545.8.5(b):

The prepayment penalty for a loan secured by a home occupied or to be occupied in whole or in part by a borrower shall not be more than 6 months' advance interest on that part of the aggregate amount of all prepayments made on such loan in any 12 month period which exceeds 20% of the original principal amount of the loan.

Under that federally adopted language, a prepayment penalty might range as high, in the case of the Potes, as $1496 (4¼% of $35,200).

**44.** For cases from jurisdictions other than Virginia, not otherwise referred to in this opinion, upholding the validity of due-on-sale clauses see *Gunther v. White*, 489 S.W.2d 529 (Tenn. 1973); *Malouff v. Midland Federal Savings and Loan Association*, 181 Colo. 294, 509 P.2d 1240 (1973); *Mutual Federal Savings and Loan Association v. Wisconsin Wire Works*, 71 Wis.2d 531, 239 N.W.2d 20 (1976); *First Commercial Title Inc. v. Holmes*, 92 Nev. 363, 550 P.2d 1271

(1976); *Tidewell v. Wittmeier*, 150 Ala. 253, 254–55, 43 So. 782, 783 (1907); *Stockman v. Burke*, 305 So.2d 89 (Fla.App.1975); *People's Savings Association v. Standard Industries, Inc.*, 22 Ohio App.2d 35, 257 N.E.2d 406 (1970); *Shalit v. Investors Savings and Loan Association*, 101 N.J.Super. 283, 244 A.2d 151 (1968); *Stith v. Hudson City Savings Institution*, 63 Misc.2d 863, 313 N.Y.S.2d 804 (1970); *Mutual Real Estate Investment Trust v. Buffalo Savings Bank*, 90 Misc.2d 675, 395 N.Y.S.2d 583 (1977). *Cf. Miller v. Pacific First Federal Savings and Loan Association*, 86 Wash.2d 401, 545 P.2d 546 (1976). *Contra: Baltimore Life Ins. Co. v. Harn*, 15 Ariz.App. 78, 486 P.2d 190, 193 (1971) ("Absent an allegation that the purpose of the clause is in some respect being circumvented or that the mortgagee's security is jeopardized a plaintiff cannot be entitled to equitable relief."); *Continental Federal Savings and Loan Association v. Fetter*, 564 P.2d 1013, 1019 (Okl.1977) ("No allegation was made ... to show the mortgagee's security as impaired.... We, therefore, find that it was unreasonable and inequitable for appellant to impose a one per cent transfer fee as a condition precedent to giving its consent to transfer the mortgage because neither the note nor the mortgage contained such a provision; ...").

**45.** Va.Ann.Code § 59.1–9.5 makes unlawful "[e]very contract, combination or conspiracy in restraint of trade or commerce...."

instituting, without the cooperation or assistance of others, a uniform practice of requiring acceleration of the loan upon a sale of the premises.

■ In essence, a due-on-sale clause only concerns a contractual undertaking as to when one must pay one's duly incurred debt. Its restraining effect on trade would be no more than that imposed on a homeowner and his real estate, for example, if someone were to reduce an obligation of his to judgment, and thereupon immediately should seek to realize by forcing sale of the premises. So customary a "restraint" would hardly fall within the ambit of the antitrust law without quite explicit language, none of which appears in the Virginia statute. Collection of a debt in and of itself does not constitute an antitrust violation. *D. R. Wilder Mfg. Co. v. Corn Products Refining Co.*, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915); *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed.2d 1219 (1947). The Virginia antitrust law is to be "applied and construed . . . in harmony with judicial interpretation of comparable federal statutory provisions." Va.Ann.Code § 59.1–9.17.

Furthermore, the Virginia antitrust act excludes from its operation conduct vetted by an administrative agency, state or federal.[46] We have already observed that, while Washington-Lee Savings and Loan Association is state-chartered it, in the circumstances of this case, is intimately related to activities of FNMA, FHLMC and the FHLBB, the deed of trust having been developed and approved by those federal agencies. Washington-Lee Savings and Loan Association is a seller servicer for the FHLMC, a federally related lender. The FHLMC regularly purchases interests in mortgages and deeds of trust.[47] Manifestly the several federal agencies have the authority to consider the anticompetitive effect of due-on-sale clauses.

Of course, it could be argued that Washington-Lee Savings and Loan Association is state-chartered, and no Virginia agency comparable to the FHLMC has addressed at all the question of the anticompetitive effect, if any, of due-on-sale clauses. We pass the question of why the Virginia antitrust law, if the legislature wanted to differentiate on the basis of status as federal agency contrasted to status as state agency, was drafted purely in terms of conduct. Nevertheless, in interpreting the Virginia antitrust statute, it is not reasonable to infer that the legislature intended to allow federally chartered institutions to operate with a distinct competitive advantage over essentially identical Virginia institutions.[48]

46. Va.Code Ann. § 59.1–9.4(b) provides:
    Nothing contained in this chapter shall make unlawful conduct that is authorized, regulated or approved (1) by a statute of this State, or (2) by an administrative or constitutionally established agency of this State or of the United States having jurisdiction of the subject matter and having authority to consider the anticompetitive effect, if any, of such conduct. Nothing in this paragraph shall be construed to alter or terminate any other applicable limitation, exemption or exclusion.

47. The purpose of the due-on-sale clause evidently was to deter a practice which would diminish profits or cause losses to federal savings and loan institutions. If the result for which the appellants contend could be achieved, the development would, in the course of time, inexorably lead to an increase in interest rates over and beyond and independent of increases attributable to other factors. Essentially all future purchasers of homes in the end would suffer, just to permit a relative few who,

despite sale, could hang on to the economic benefits of a mortgage or deed of trust with a favorable interest rate to benefit. Prevention of that is a public purpose which evidently outweighs the allowance of the windfall sought by the appellants in the transactions here under scrutiny. As Justice Davis dissenting in *Wellenkamp v. Bank of America, supra*, 21 Cal.3d at 954, 148 Cal.Rptr. at 386, 582 P.2d at 977 so cogently put it:

> But our beneficence may be shortsighted. For in attempting to assist the Wellenkamps, the majority opinion must necessarily restrict if not dry up mortgage funds otherwise available to the next generation of borrowers.

48. One can only wonder where it leaves the jurisprudence of California with its state court decision, *Wellenkamp v. Bank of America*, 21 Cal.3d 943, 148 Cal.Rptr. 379, 582 P.2d 970 (1978), decided August 25, 1978, essentially voiding due-on-sale clauses for state lending institutions speedily followed, on November 1, 1978, by *Glendale Federal Savings and Loan*

It is a bizarre reading of an antitrust statute which leads to imposition of a palpable competitive disadvantage.

Moreover, there is also an exclusion from the reach of the Virginia antitrust law for conduct that is authorized, regulated, or approved by a Virginia statute. Va.Ann. Code § 59.1–9.4(b)(1). While appellants strenuously contend that Va.Ann.Code § 6.1–330.34 calling for prominent display of a notice that there is a due-on-sale clause whenever one appears in a mortgage or deed of trust is not an approval, we conclude that the manifestly broader coverage of "authorized, regulated *or* approved" suffices to insulate due-on-sale clauses from the Virginia antitrust law, at any rate when considered solely in and of themselves and not in connection with other activities.

Thus, the due-on-sale clause was fully enforceable against the Potes.

*Judgment in all of the Consolidated Cases AFFIRMED.*

*Association v. Fox*, 459 F.Supp. 903 (C.D.Cal. 1978), which held valid due-on-sale clauses in lending documents of federal associations. The state can hardly relish the competitive disadvantage inexorably following for state lending associations.