IN THE MATTER OF THE FORECLOSURE OF THE DEED OF TRUST EXECUTED BY MURRAY BONDER AND WIFE, ANNE S. BONDER (PROPERTY NOW OWNED BY RICHARD S. ROBINSON AND WIFE, IRENE K. ROBINSON) DATED OCTOBER 6, 1972, AND RECORDED IN BOOK 739, PAGE 87, JOHNSTON COUNTY REGISTER OF DEEDS, CHARLES H. YOUNG, TRUSTEE

No. 56PA82

(Filed 3 August 1982)

1. **Mortgages and Deeds of Trust § 15— deed of trust on residential property— requirement of written consent for transfer of property—acceleration clause— increased rate of interest for transferee**

   Provisions in a note and a deed of trust on residential property giving the lender the option to accelerate maturity of the loan upon failure of the borrowers "to observe, keep and perform any of the agreements, covenants and conditions herein set out" and prohibiting the borrowers from conveying the property without the written consent of the lender constituted a valid, nonrestricted due-on-sale clause which could properly be used by the lender to require a transferee of the security property to pay an increased rate of interest in order to assume the loan on the property.

2. **Mortgages and Deeds of Trust § 15— due-on-sale clause—use to generate higher interest**

   G.S. 24-10(d), relating to maximum fees on loans secured by realty, has no bearing upon the ability of a due-on-sale clause to generate higher interest when the original borrower later transfers the property securing a loan.

Justices MITCHELL and MARTIN did not participate in the consideration or decision of this case.

Justice MEYER dissenting.

APPEAL by respondents pursuant to G.S. 7A-31 for discretionary review of the decision of the Court of Appeals (*Judge Whichard*, with *Judges Vaughn* and *Hill* concurring) reported at 55 N.C. App. 373, 285 S.E. 2d 615 (1982). The Court of Appeals affirmed the order entered by *Brannon, Judge*, at the 3 November 1980 Civil Session of Superior Court in JOHNSTON County, which permitted foreclosure upon a residential deed of trust.

The facts underlying this legal controversy are largely undisputed and are summarized as follows. On 6 October 1972, Murray Bonder and his wife, Anne S. Bonder, borrowed $50,000 at the interest rate of 7¾% per annum for the purchase of residential real estate from Raleigh Savings and Loan Association, which later became Raleigh Federal Savings and Loan Association (hereinafter referred to as the "Association"). The Bonders' loan was secured by a promissory note and a deed of trust. Neither instrument contained a prepayment penalty clause. The note included the following pertinent provision:

> We hereby agree that in case of non-payment of any installment of principal or of interest thereon, or any part of either, prior to the payment date of the next monthly installment, *or in case of default in the performance of any of the agreements or conditions of the deed of trust hereinafter mentioned*, then the whole of said principal sum remaining unpaid, together with interest thereon, and any other sums secured by said deed of trust, at the option of the payee or the legal holder hereof, shall become due and payable immediately, in which event the power of sale contained in said deed of trust may be immediately exercised. [Emphases added.]

The accompanying deed of trust similarly provided that:

> If . . . the parties of the first part [the Bonders] shall fail to pay any installment of the note herein described, or any part thereof, as the same shall hereafter become due; or shall fail to pay, when due, according to the terms and provisions thereof, any loan or advance hereafter made, principal and interest, or any part of either; *or shall fail to observe, keep and perform any of the agreements, covenants and conditions herein set out and agreed to be observed, kept and performed by the parties of the first part*, then and in any such

event the entire amount of such note, loans, advances and any other amounts hereby secured, shall at the option of the holder of the note thereby secured immediately become due and payable; and upon application of the Association or the holder of the note or notes secured hereby, it shall be lawful . . . to sell the lands and premises hereinabove described at public auction to the highest bidder for cash. . . . [Emphases added.]

Among other things, the Bonders agreed, under the express terms of the deed of trust, that they would "not convey the premises . . . without the consent in writing of the Association, its successor or assigns. . . ."

On 4 June 1980, Richard S. Robinson and his wife, Irene K. Robinson, contacted the Association concerning their desire to purchase the Bonders' property by assumption of the loan already secured thereupon. The Association advised the Robinsons that the assumption agreement would require the payment of additional interest at the rate of 12% per annum. Upon learning this, the Robinsons discontinued their efforts to apply for an assumption of the Bonders' indebtedness with the Association. On 19 June 1980, the Bonders' attorney wrote a letter to the Association requesting its written consent for conveyance of the property. The Association did not reply to the letter or furnish such consent. The Bonders nonetheless conveyed the secured property to the Robinsons on 27 June 1980 by means of a warranty deed. Thereafter, the Robinsons tendered to the Association monthly installments of principal and interest in the amount and at the rate originally specified in the Bonder note and deed of trust. The Association refused to accept such payments; instead, it demanded immediate and full payment of the loan from the Bonders based upon their breach of the covenant prohibiting transfer of the property without the Association's prior written consent thereto. As the Bonders apparently did not honor this demand, the Association initiated a foreclosure proceeding upon the property pursuant to the terms of the deed of trust.

On 19 September 1980, the Johnston County Clerk of Superior Court concluded that the Bonders (respondents) had not defaulted upon the loan by reason of their conveyance of the property to the Robinsons and dismissed the Association's (peti-

tioner) action for foreclosure. Upon the Association's *de novo* appeal, the Superior Court entered an order authorizing the foreclosure. On respondents' appeal, the Court of Appeals affirmed the Superior Court and held, in reliance upon *Crockett v. Savings & Loan Assoc.*, 289 N.C. 620, 224 S.E. 2d 580 (1976), that: (1) the covenant in the deed of trust requiring the lender's written consent to the transfer of the secured property and the accompanying provision for acceleration of the maturity of the total indebtedness upon the breach of any covenant combined to form a "due-on-sale" clause "which the lender [could use] to extract enhanced interest upon transfer of the security property"; and (2) since the language of the note and deed of trust was unambiguous regarding the non-restricted right of the lender to call the loan due and payable in full upon the borrowers' breach of any covenant therein, the trial court properly excluded respondents' proffered evidence concerning the parties' intent to limit such right to the situation where the lender's security might actually be threatened or impaired by the transfer. 55 N.C. App. at 376, 285 S.E. 2d at 616-17. Respondents finally appeal to our Court for dismissal of the foreclosure proceeding.

*Womble, Carlyle, Sandridge & Rice, by A. L. Purrington, Jr., and H. Grady Barnhill, Jr., for the petitioner-appellee.*

*Mast, Tew, Armstrong & Morris, by George B. Mast and L. Lamar Armstrong, Jr., for respondent-appellants.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by L. P. McLendon, Jr., Edward C. Winslow, III and Randall A. Underwood, amicus curiae for the North Carolina Savings and Loan League.*

COPELAND, Justice.

The most significant issue precisely raised in this appeal is whether a savings and loan institution may demand full and present payment of the total outstanding amount of a loan secured by a deed of trust upon residential real estate if the borrowers breach their covenant in the deed not to convey the property without the institution's consent and then, in the event of the borrowers' failure to comply with the demand for payment, institute foreclosure proceedings upon the property in accordance with our statutes. We hold that the lending institution may indeed do so

where, as here, the language of the promissory note and deed of trust clearly bestow such a right in its favor.

Our previous decision in the case of *Crockett v. Savings & Loan Assoc.*, 289 N.C. 620, 224 S.E. 2d 580 (1976), is both instructive and controlling here. The loan instruments in *Crockett* contained similar language which permitted the beneficiary in the deed of trust (mortgagee) to call the entire debt due and payable if the owner of the property (mortgagor) sold or transferred the property without the beneficiary-lender's consent. Recognizing that this kind of contractual language constituted a due-on-sale clause, we allowed full enforcement thereof by the savings and loan association and held that: (1) the due-on-sale clause was not a *per se* invalid restraint upon the property owner's right of alienation; (2) the clause could be validly exercised by the lender even though the transfer of the property did not actually impair its security or affect repayment of the original loan; and (3) the lender could withhold its consent to the conveyance for the sole purpose of seeking an increased interest rate upon the owner's original indebtedness so long as there were no prepayment penalties, and the demand therefor was not fraudulent, inequitable, oppressive or unconscionable. Our basic reasoning in *Crockett* is, on its face, applicable to the facts at bar and apparently requires some repeating:

> Merely by paying off the loan, plaintiff-trustor-borrower or the prospective conveyee can comply with the due-on-sale clause and insure that upon alienation the buyer will not lose his property by exercise of the right to foreclose. It is significant that requiring the loan to be paid off does not involve an extraction of a penalty. Unless the debtor pursues another course of action, the creditor is merely returned the still outstanding amount of the loan that was made to facilitate plaintiff's original purchase. *Thus, there is no real freezing of assets or discouragement of property improvement on account of the due-on-sale clause since the property can be freed by simply paying off the loan.* Moreover, the due-on-sale clause is part of an overall contract that facilitates the original purchase and, thus, promotes alienation of property.
> . . .

. . . .

. . . [U]nder the loan agreement entered into in this case, plaintiff could prepay at anytime without penalty. Thus, defendant-beneficiary-lender would lose any profit or advantage he otherwise would have if he retained the loan, interest rates declined, and plaintiff prepaid. Although plaintiff-trustor-borrower might have to pay a re-financing charge, he would be able to prepay whenever he chose and take advantage of lower interest rates in the market. Plaintiff would not have to wait .for an alienation of the property before being permitted to take advantage of changed interest rates. Thus, as between plaintiff-trustor-borrower and defendant-beneficiary-lender, plaintiff is in a more favorable position for taking advantage of fluctuations in interest rates assuming the due-on-sale clause is permissible. If the due-on-sale clause is not permissible, the plaintiff would have an even superior position. Additionally, we note that a lender could have charged a prepayment penalty of 1% for prepayment of a loan within the first year of the loan under G.S. 24-10, but otherwise no prepayment penalty would have been permissible. *Thus, in order to balance the ability of lender and borrower to take advantage of fluctuations in interest rates, equities favor the limited adjustment permissible by the due-on-sale clause.*

. . . In fact, a fair contractual agreement would appear to support a loan with no prepayment penalty and a due-on-sale clause. The immediate buyer has the security of having the ability to pay off his loan at no greater than the initial interest rate, and he can get a more favorable loan if interest rates decline. The lender can get a more favorable loan agreement if interest rates rise and there is a new owner of the realty.

In essence, it is the lender who has provided the opportunity for the initial purchaser to buy the realty. *It seems fair for the lender to be able to contract to receive an increased interest rate, on the very loan that is facilitating transfer of the property, in the event the original purchaser decides he is not going to continue ownership or pay off the loan so as to have full equity in the realty.* A prime purpose of the loan was to enable the buyer to purchase the realty. If the buyer sells before he obtains full equity, this purpose

ceases. Under our free enterprise system the lender may lend his money under such terms as maximize his profits within the limits set by law. . . .

In the absence of a due-on-sale clause, plaintiff-trustor-borrower would receive a premium for a favorable loan assumption when he sold his realty. This premium would be the result of the long term loan contract and a fortuitous rise in interest rates. By operation of the due-on-sale clause plaintiff is not able to realize this premium. *Upon sale of the realty plaintiff receives the fair market value of the realty without further benefiting from the loan he received.*

289 N.C. at 625-27, 224 S.E. 2d at 584-85 (emphases added). We reaffirm this sound reasoning today.

In essence, respondent-appellants attack the citadel of *Crockett* with little more than the same arguments advanced there by Justice Lake in his dissent. *See* 289 N.C. at 632-44, 224 S.E. 2d at 588-95; *see also* Note, Real Property Security — North Carolina Deals Mortgagors a Bad Hand, 13 Wake Forest L. Rev. 490 (1977). We shall not plow this ground again; instead, we stand firmly upon that which we so carefully tilled before. Nevertheless, we find it necessary to dispose of two contentions emphasized by respondents in their brief and during oral argument.

First, respondents say that the prior construction of a due-on-sale clause in *Crockett* should not be authoritative as to the enforceability of such a provision with respect to *all* real estate loan instruments since the property involved there was *commercial,* and here it is *residential.* We disagree. Our analysis in *Crockett* did not rely upon or refer to such a distinction, and we do not believe that one is merited now. Our opinion in *Crockett* was wholly based upon the unambiguous character of the contractual provisions of the loan instruments, not upon the specific character of the underlying property or the bargaining position of its purchaser. Justice Lake even conceded in his dissent that the rationale employed by the Court extended to "mortgages of typical family residences," 289 N.C. at 642, 224 S.E. 2d at 594, and we expressly so hold. We shall not assume that a residential borrower (or his attorney) is *per se* less capable than a commercial borrower of reading and understanding that which is printed in plain English in the instruments required for his obtention of a real

estate loan.[1] The due-on-sale clause is purely a matter of contract, and we shall not interfere with what the parties clearly contracted to do in that regard, whomever they may be, or retroactively change the manner in which they agreed to bind themselves. In sum, it is appropriate to quote once again the wise words of Justice Higgins in *Roberson v. Williams*, 240 N.C. 696, 700-01, 83 S.E. 2d 811, 814 (1954): "Ordinarily, when parties are on equal footing, competent to contract, enter into an agreement on a lawful subject, and do so fairly and honorably, the law does not permit inquiry as to whether the contract was good or bad, whether it was wise or foolish." *See Crockett, supra*, 289 N.C. at 630, 224 S.E. 2d at 587.

Secondly, respondents argue that the language in the loan instruments which is at issue in this case does not actually "amount to" a due-on-sale clause. Their sole basis for saying so is that the provision in the deed of trust requiring the Association's consent to conveyance of the secured property does not appear, as it did in *Crockett, supra, in the same paragraph* with the provision stating that the borrower's breach of agreements, covenants or conditions in the deed would trigger the Association's right to accelerate the maturity of the loan and demand full and present payment thereof. Such a distinction would certainly be artificial, and it would completely ignore the unmistakable substance of the deed's terms when they are, as they should be, read together as a consistent whole. In any event, we are satisfied that any doubt whatsoever concerning the interrelated nature of the foregoing provisions in the deed of trust is dispelled by the all-inclusive provision in the promissory note, which was also present in *Crockett*, that "in case of default in the performance of *any* of the agreements or conditions *of the deed of trust* hereinafter men-

---

1. There is, by the way, no allegation in this record that the Bonders did not fully comprehend the terms of their note and deed of trust. In fact, in this regard, their actions in the transfer of the property speak much louder than their words in this lawsuit. The record shows that they understood their covenants in the deed well enough to know that the prospective purchasers had to apply directly to the Association for an assumption of their loan, which the Robinsons initially did. Further, as evidenced by their attorney's subsequent letter to the Association, they also knew that they had to get the Association's written consent before they could convey the property. Despite such knowledge and understanding, the Bonders sold the property in flagrant violation of the Association's contractual rights with respect to transfer of the security.

tioned, then the whole of said principal sum remaining unpaid, together with interest thereon . . . shall become due and payable immediately. . . ." *See* 289 N.C. at 621, 224 S.E. 2d at 582 (emphases added).

We hold that the Bonders' home loan instruments with the Association contained a valid, non-restricted due-on-sale clause which the Association could fully enforce for the purpose of extracting higher interest from potential buyers of the secured residential property. We note that our decision reflects the majority trend on the issue today, whereas a respectable split of authority existed at the time we rendered our earlier decision in *Crockett, supra. See* Annot., 69 A.L.R. 3d 713 at § 4 (1976 and 1981 Supp.); Randolph, The FNMA/FHLMC Uniform Home Improvement Loan Note: The Secondary Market Meets the Consumer Movement, 60 N.C. L. Rev. 365, n. 1 at 365-66 (1982); *see, e.g., Lipps v. First American Service Corp.,* --- Va. ---, 286 S.E. 2d 215 (1982); *Mills v. Nashua Fed. Sav's. and Loan Assoc.,* 121 N.H. 722, 433 A. 2d 1312 (1981); *First Fed. Sav. & Loan Ass'n., Etc. v. Jenkins,* 109 Misc. 2d 715, 441 N.Y.S. 2d 373 (Sup. Ct. 1981); *First Fed. Sav. & Loan Ass'n., Etc. v. Kelly,* 312 N.W. 2d 476 (S.D. 1981). *But see State ex rel. Bingaman v. Valley Sav. & Loan,* 97 N.M. 8, 636 P. 2d 279, and cases cited at 283 (1981). We adhere to the rationales utilized in recent decisions upholding the enforcement of a due-on-sale clause in a residential mortgage in light of the reality of the true economics and banking interests involved, of which the following is a sampling:

> Whatever the precise numbers, it is clear that lenders negotiate home loans with the realistic expectation that they will not be held to maturity, and interest rates are adjusted accordingly. The device used to activate the "early" (actually *anticipated*) payoff before maturity is the due-on-sale clause, which reduces interest rate risk by reducing the average time over which a mortgage loan is outstanding. Invalidating the due-on-sale clause would in effect extend the life of the average mortgage loan perhaps two or three times longer than the lender had originally anticipated, intensifying the lender's risk of interest rate loss. It is fair to conclude that because of the reduced risk, use of an acceleration device *lowers* the interest rate at which the bank is willing to loan money. Viewed from this perspective, it can be argued that

the mortgagors have already had the benefit of the clause which they now seek to invalidate.

*Dunham v. Ware Sav. Bank*, --- Mass. ---, 423 N.E. 2d 998, 1001-02 (1981).

Calling a loan in order to get the full benefit of current interest rates is a legitimate and reasonable business practice — one which protects the Association members and their savings investments as well as fulfilling the statutory purpose of the association.

. . . .

By the enforcement of the acceleration clause in this case, Century seeks only to protect itself and its members from the inflationary and deflationary conditions of the money market. Such a motive is neither unlawful nor improper. The officers and directors of a savings and loan association have a fiduciary obligation to their depositors to obtain the best lawful yield of their mortgage portfolio.

. . . The issue here is who will reap the profit. The VanGlahns seek it, by selling the property at a higher price, since its value is enhanced by the 7½% mortgage. On the other hand, Century seeks the additional profit which it would gain by loaning the principal at the current rates. The contractual rights of a mortgagee are no less entitled to the recognition and protection of the court than those of the mortgagor. . . . Accordingly, the "motive" of the mortgagee in this case, namely, accelerating the balance due so that it may receive higher interest rate on same when it is subsequently loaned, is proper, and the balance due may be accelerated.

*Century Fed. Sav. & Loan Assn. v. Van Glahn*, 144 N.J. Super. 48, 54-55, 364 A. 2d 558, 561-62 (1976) (citation omitted).

In current market conditions, the due-on-sale clause obviously would be viewed with distaste by people in the shoes of Mrs. Bailey, for a mortgage or deed of trust which could otherwise continue until the original fixed maturity date (here 2007) at an extremely favorable interest rate (10% as against the current 15%) would be lost to them. Such a loan,

In re Foreclosure of Bonder

if transferable to a buyer through assumption thereof as part of his purchasing arrangements, would have a distinct economic value. . . .

In the final analysis, one must conclude that people like Mrs. Bailey are simply too eager to shift to others burdens properly belonging on their own shoulders. Even if the due-on-sale clause is valid, and has been triggered, and Mrs. Bailey, must, therefore, accelerate and pay off the balance due on her deed of trust loan, she, nevertheless, has been a beneficiary economically, vis-a-vis the deed of trust lender, as a result of the borrowing. The effects of inflation have served to erode the real, as distinct from the face, value of money. Hence, paying off $53,903.63 borrowed in 1977 with $53,903.63 of 1980 or 1981 dollars provides Mrs. Bailey with a tidy economic advantage.

. . . .

The lenders are not favored creatures of the law, at least as compared to borrowers. They must dot the "i"s and cross the "t"s.

. . . .

Nevertheless, the lenders have legal rights too. If they have complied with all requirements of the law, they are entitled to enforce their due-on-sale clauses for they are simply not restraints on alienation.

. . . .

. . . There is nothing inherently unfair or unreasonable in such a rule. The reason making it important that the loan should run its full 30 year course dissipates when the homeowner sells.

*Williams v. First Fed. Sav. & Loan Ass'n., Etc.*, 651 F. 2d 910, 915-16, 926-28 (4th Cir. 1981) (footnote omitted).

The United States Supreme Court similarly recognized the basic economics involved in this situation in its landmark decision, *Fidelity Federal Sav. '& L. Assn. v. De La Cuesta*, 50 U.S.L.W. 4916, 4923 (1982), wherein it held that the Federal Home Loan Bank Board's regulation permitting federally chartered savings

and loan associations to include due-on-sale clauses in their loan instruments pre-empted California's conflicting state law limitations upon the operation and enforcement of such clauses. To avoid any confusion upon this subject, we should say that there is no conflict between North Carolina and federal law concerning due-on-sale clauses. A *federal* savings and loan was involved in *Crockett, supra,* and a pre-emption question was raised in an *amicus* brief. However, our Court did not consider that facet of the case and instead relied upon principles of state law. *See* 289 N.C. at 632, 224 S.E. 2d at 588. We thus believe that the combination of *De La Cuesta, Crockett* and this opinion settle the issue in this jurisdiction concerning the general validity and enforceability of due-on-sale clauses in real estate loan instruments whether the lender be a state or federally chartered savings and loan association and whether the property be commercial or residential.

Respondents' additional contention concerning the trial judge's erroneous exclusion of evidence offered to show an intended restriction upon the due-on-sale clause by the parties in this case is meritless and must be overruled since the language of the provisions was unambiguous as written. *See Crockett, supra,* 289 N.C. at 631, 224 S.E. 2d at 587-88, and cases there cited.

[2] Respondents' final argument is that G.S. 24-10(d) prohibits an increase in interest rates upon a real estate loan by virtue of a due-on-sale clause. This position is inappropriately taken for the first time in our Court, and it is not supported by a corresponding assignment of error in the record on appeal. Nevertheless, it suffices to say that this statute has no bearing upon the ability of a due-on-sale clause to generate higher interest when the original borrower later transfers the property securing the loan. G.S. 24-10 is entitled "Maximum *fees* on loans secured by real property" (emphasis added), and its scope plainly does not extend to, nor does it even address, the separate and different issue of *interest rates.*

The decision of the Court of Appeals is affirmed.

Affirmed.

Justices MITCHELL and MARTIN did not participate in the consideration or decision of this case.

Justice MEYER dissenting.

I must respectfully dissent. Given the fact that *Crockett* is now the law of this State, I have no difficulty with the conclusion of the majority opinion as being in accord with *Crockett* so far as it relates to true "due on sale" instruments. I am astonished, however, that the majority has concluded that the language of the instrument before us constitutes "a valid, non-restricted due-on-sale clause which the Association could fully enforce for the purpose of extracting higher interest from potential buyers of the secured residential property."

In a rather lengthy opinion of some fourteen pages only one paragraph is devoted to an interpretation of the language in the instrument before us. Not a single case is cited bearing the language of the trust instrument in this case. The only case cited is *Crockett*, which the majority candidly admits does not contain the same, but only "similar" language. Even if one agrees that the decision in *Crockett* is correct in the context of a commercial loan, or for that matter, even in the context of a residential loan, it should not be controlling here.

I believe it is at least noteworthy that the majority opinion does not set out the precise language in *Crockett* and compare it in detail with the language of the *Bonder* trust instrument. The difference is telling:

The *Crockett* language:

'[I]f the property herein conveyed is transferred without the written assent of Association, then . . . the full principal sum with all unpaid interest thereon shall at the option of Association, its successors or assigns, become at once due and payable without further notice and irrespective of the date of maturity expressed in said note.'

289 N.C. 620, 631, 224 S.E. 2d 580, 587-88 (1976).

Even if one disagrees with the result in *Crockett*, at least the foregoing language is clear — sale without consent accelerates maturity at the election of the lender. Both the requirement of consent and the penalty for failing to secure consent are found not only in the same paragraph but also within the same sentence.

The *Bonder* language:

> If, however, the parties of the first part . . . shall fail to observe, keep and perform any of the agreements, covenants and conditions herein set out and agreed to be observed, kept and performed by the parties of the first part, then and in any such event the entire amount of such note, loans, advances and any other amounts hereby secured, shall at the option of the holder of the note hereby secured immediately become due and payable . . . .

The foregoing appears in the middle of a lengthy paragraph on page 3 of the form. Some ten paragraphs later, as if a horse following the cart, there appears the following:

> That they will not convey the premises herein described without the consent in writing of the Association, its successor or assigns; and that no sale by the parties of the first part of the premises herein described and no forbearance or extension of time granted by the Association for the payment of the note or other indebtedness from time to time secured hereby to the parties of the first part (or to any other person in whom title to the premises herein described is vested) shall operate to release, modify or affect the liability of the parties of the first part as provided herein, or shall affect the validity or priority of the lien of this deed of trust.

Unlike the plain and concise language of the *Crockett* instrument, the language of the *Bonder* instrument requires a patching together of separate parts in order to construct a due-on-sale interpretation. This construction requires too much license and certainly cannot be said to correspond to, the expectations of the parties when the instrument was signed. Before the advent of today's raging inflation, the traditional notion of circumstances which justified withholding of consent to the transfer and assumption of the mortgage was a sale and assumption which jeopardized the lender's security interest.

It should be emphasized that the Savings and Loan here did not refuse to permit the assumption of the note and deed of trust by the Bonders—it in fact agreed to it—but only upon the in-

crease of the interest rate from 7¾% to 12% per annum.[1] It is absolutely clear that the Savings and Loan did not question the creditworthiness of the Bonders. It simply wanted to extract additional interest. I hasten to point out that I would not question that motive so long as it reasonably appears that an enhanced interest rate upon sale was within the contemplation of the parties when the document was executed. The more modern deeds of trust generally include in plain language not only true due-on-sale provisions but more recently, variable interest rate provisions and provisions specifically for increasing the interest rate on sale.

I feel compelled to take issue with two other aspects of the majority opinion. First, unlike the majority, I am totally unwilling to say that "there is no conflict between North Carolina and federal law concerning due-on-sale clauses" without one sentence of analysis. I consider such a statement, without any analysis of the status of the federal law and comparison with our own, reckless and one which will come back to haunt us. The majority's brief treatment of *De La Cuesta* certainly does not justify such a statement. That case simply held that the Federal Home Loan Bank Board's regulation permitting federal savings and loan associations to include due-on-sale clauses in their loan instruments pre-empts conflicting State limitations on the operation and enforcement of such clauses. In the case before us there is no question of possible conflict between federal and state law. In fact, there is not present in the case even any question concerning the validity or enforceability of proper due-on-sale clauses. The only question before us is whether the language of the trust instrument here constitutes a due-on-sale clause. We should not blatantly announce that there is an absence of any conflict between federal and North Carolina law concerning due-on-sale clauses until the question is properly before us, fully briefed, fully researched and fully considered by this Court.

Second, the majority has completely mischaracterized a portion of Justice Lake's dissent in *Crockett* as a concession "that the *rationale* employed by the Court extended to 'mortgages of typical family residences.'" It was the result in the case and not

---

1. Query whether a demand for an increase from 7¾% to the current rate of 16% or 17% would be "unconscionable," "inequitable," or at least "oppressive" and therefore not permissible even under *Crockett*.

the rationale employed by the court to reach that result that Justice Lake interpreted to extend to mortgages of typical family residences. It is crystal clear that Justice Lake felt that the rationale as well as the result, when extended to typical residential loans, would be totally unrealistic.

> As I read the majority opinion, it holds that use of a 'Due-on-Sale Clause' for the sole purpose of requiring an increase in the rate of interest is reasonable and not oppressive and, therefore, entitled to the protection of the court. In the present case, the mortgaged property is not a single family residence but is a block of apartment houses. The mortgagor and Mrs. Crockett are thus investors in business property. They may, therefore, be on approximately 'equal footing' with the defendant. The majority opinion, however, does not rest upon this circumstance. It extends, apparently, to mortgages of typical family residences. When so extended, even if not when applied to the present case, the entire basis for the majority opinion seems to be utterly unrealistic.

289 N.C. at 642, 224 S.E. 2d at 594.

I vote to reverse the decision of the Court of Appeals and remand the case for ultimate dismissal of the foreclosure proceeding.